Corenna TAYLOR, Plaintiff,

v.

James H. JONES, Defendant,

United States of America, Intervenor.

No. LR-C-76-90.

United States District Court,
E. D. Arkansas, W. D.

Aug. 8, 1980.

See also, 489 F.Supp. 498.

---

John W. Walker, Richard Quiggle, Little Rock, Ark., for plaintiff.

David L. Williams, Asst. Atty. Gen., for the State of Arkansas, Doug Chavis, III, Asst. U. S. Atty., E. D. Arkansas, Little Rock, Ark., Lt. Col. Robert A. DeMetz, Washington, D. C., for defendant.

## OPINION

ARNOLD, Circuit Judge, sitting by designation.

On April 11, 1980, this Court granted in part the motion of the defendant Jones for a new trial. The Court's previous holding that plaintiff had been discriminated against in respect of her first-held position of recruiter was vacated. The question of what equitable relief, if any, would be appropriate was held in abeyance. The new trial was to be limited to these two issues: whether plaintiff's non-renewal as a recruiter was racially motivated, and what permanent equitable relief should be granted. The partial new trial was held on May 29, June 2, June 4, June 5, and June 6, 1980. At the conclusion of the new trial, the Court announced certain findings and conclusions from the bench, and these were later embodied in a written order.[1]

In the meantime, the defendant Jones had appealed to the Court of Appeals from this Court's interim injunction. On June 10, 1980, the Court of Appeals heard oral argument on the motion of the defendant

---

1. A copy of this order is reproduced as Appendix A to this opinion.

Jones to stay or modify this Court's injunction *pendente lite.* This motion was supported by the United States, which had been granted leave to intervene in the Court of Appeals, as well as here. On June 12, 1980, the Court of Appeals entered an order declining to rule, for the time being, on the motion for stay or modification. The case was remanded to this Court to permit it to prepare its findings of fact and conclusions of law, enter final judgment, and re-certify the case to the Court of Appeals. In addition, the order of the Court of Appeals set forth four specific issues to be addressed by this Court.

The post–trial briefs directed by this Court have now been filed and read. The last such document was filed here on July 22, 1980. This Court therefore now makes the following findings of fact and conclusions of law, pursuant to which final judgment will be entered and certified to the Court of Appeals in accordance with its order of June 12, 1980.

## I. BACKGROUND

The facts of this case, so far as they have already been set forth in this Court's three previous published opinions, will not be repeated here. It may be useful, however, to sketch briefly the nature of the Arkansas National Guard and the various categories of employees and military personnel discussed by the witnesses. The Arkansas National Guard is simply "the Militia" of the State of Arkansas, mentioned at several points in the Constitution of the United States. Under Article I, Section 8, Clause 16, for example, the Congress is given power

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

In addition, under Article I, Section 8, Clause 15, Congress may call forth the Militia "to execute the Laws of the Union, suppress Insurrections and repel Invasions."

When "the Militia of the several States" is "called into the actual Service of the United States," the President is its commander–in–chief, Article II, Section 2, Clause 1. As the Constitution itself provides, state militias are a hybrid. They have some of the characteristics of federal instrumentalities, and some of the characteristics of state instrumentalities. The importance of the Militia is further underscored by the Second Amendment, which notes that "a well–regulated Militia" is "necessary to the security of a free State . . . ."

The commander–in–chief of the Arkansas National Guard, except at such times as it is called into the active service of the United States, is the Governor of Arkansas. The military head of the Guard is the Adjutant General, an officer appointed by the Governor. James H. Jones, the named defendant in this case, has been Adjutant General since 1979. Acting under its constitutional power quoted above, Congress has "federally recognized" the Arkansas National Guard, as it has the Militia of every other state, and has laid down detailed provisions by law for the organization, arming, and disciplining of the Guard. Thus, every person who becomes a member of the Arkansas National Guard is also a member of the National Guard of the United States, a military entity under the administrative supervision of the National Guard Bureau, which is part of the Department of Defense. Under 32 C.F.R. § 564.-1(f), the appointment of the Adjutant General of a state and his tenure of office are governed by the laws of the state. No officer may be federally recognized for the position allotted for the Adjutant General other than the officer appointed as the Adjutant General of the state. As required by the Constitution, the appointment of officers in a state's national guard is a function of the state concerned. 32 C.F.R. § 564.-2(a)(2).

The Adjutant General, sometimes also referred to as the head of the State Military Department, is the appointing authority for all personnel, both civilian and military, within the Department. He has full power to hire, fire, place, and assign, subject to

valid federal regulations authorized by statute. Except when the National Guard is on the actual service of the United States, the Department of Defense has no command authority over the Adjutant General.

Personnel of the military department are divided into two main categories: military and civilian. The military category includes all "members" of the National Guard. These people all have a military rank, either as enlisted persons, warrant officers, or commissioned officers. Most of the military personnel of the National Guard are actively associated with it only on week ends and during a training period each summer. Some military personnel, however, are on full–time military duty. In addition, some members of the National Guard who have active military status only during the summer training period and on week ends are also employed by the Guard in a civilian capacity.

Civilian employees of the Guard fall into two categories: federal and state. "Federal employees," also known as "technicians," must, as a condition precedent, be members of the Guard, with some exceptions not here relevant. That is they must have a military status and rank before being eligible for employment as a federal technician. The Arkansas National Guard has about 986 federal employees. These people work regular civilian hours and are subject, in their capacity of civilian federal employees, to civil–service regulations. All of these federal employees are paid with federal funds. In addition, the Arkansas National Guard has about 115 state employees. These persons, who may or may not have any military status, or be members of the Guard, fill positions created by the law of Arkansas. Some of them are paid with state funds, and some with federal funds, but the federal funds from which they are paid are placed in the State Treasury and disbursed therefrom in accordance with appropriations bills passed by the state General Assembly. The Adjutant General supervises and has authority over all military and civilian personnel of the Guard, including members, federal employees, and state employees, whatever their current status may

be, and wherever the funds to pay their salaries may come from.

## II. THE PLAINTIFF'S CLAIM WITH RESPECT TO THE POSITION OF RECRUITER

After the first trial, on February 20 and 21, 1980, the Court found that the plaintiff, Corenna Taylor, had been terminated as a recruiter because of her race (a finding later vacated), and that she had later been constructively discharged from her position as mail–room clerk because of her race. There is no dispute as to Ms. Taylor's status in the later–held position of mail–room clerk. She was a state employee and, as such, was indisputably subject to Title VII of the Civil Rights Act of 1964.

■ At the time of the first trial, the Court was under the impression that Ms. Taylor's recruiter position was as a federal employee, to whom Title VII (albeit a different section) is also applicable. This impression was incorrect. Evidence adduced at the trial, when considered in context, makes it clear that Ms. Taylor was not either a federal or a state employee when she functioned as a recruiter during the second quarter of 1974. She was, at this time, a member of the Arkansas National Guard on full–time duty in military status. Title VII is therefore not applicable. *Johnson v. Alexander,* 572 F.2d 1219 (8th Cir.), cert. denied, 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978).

It does not follow, however, that plaintiff has no cause of action with respect to the non–renewal of her appointment as a recruiter. Plaintiff has pleaded two other theories: 42 U.S.C. § 1981, and an implied right of action to enforce the equal-protection component of the Due Process Clause of the Fifth Amendment. (Presumably the Fifth Amendment, rather than the Fourteenth, would be the appropriate constitutional provision, since as a recruiter plaintiff was in a military status defined by federal law and regulations.) In order to determine the applicability of the latter theory, the Court would have to decide whether a private right of action to redress

racial discrimination in violation of the Fifth Amendment may be implied by analogy to *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Compare *Bishop v. Tice,* 622 F.2d 349 (8th Cir. 1980). The Court finds it unnecessary to discuss the availability of a *Bivens* theory, because it seems clear that 42 U.S.C. § 1981, which was pleaded in plaintiff's complaint, will afford relief if plaintiff has proved by a preponderance of the evidence that her appointment as a recruiter came to an end because of deliberate and conscious racial discrimination.

▆▆ Section 1981 provides as follows: All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The operative language of this statute originated in Section 1 of the Act of April 9, 1866, 14 Stat. 27, re–enacted by Section 16 of the Act of May 31, 1870, 16 Stat. 144. The Civil Rights Act of 1866 was enacted pursuant to Congress's authority under Section 2 of the Thirteenth Amendment. It applies to all types of racial discrimination, state or federal, public or private. As the Supreme Court said in *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 426, 88 S.Ct. 2186, 2196, 20 L.Ed.2d 1189 (1968), Section 1 of the Civil Rights Act of 1866 "was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute, . . . ." The unanimous opinion in *District of Columbia v. Carter,* 409 U.S. 418, 422, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1973), is to the same effect:

> Moreover, like the Amendment upon which it is based, § 1982 is not a "mere prohibition of state laws establishing or upholding" racial discrimination in the sale or rental of property but, rather, an "absolute" bar to all such discrimination, private as well as public, federal as well as state.

It is true that these two cases, *Jones* and *Carter,* involved not Section 1981, pleaded by plaintiff here, but Section 1982, which has to do with ownership of property. The latter section, however, originated as a clause of Section 1 of the Civil Rights Act of 1866, just as Section 1981 did. The two provisions, therefore, are to be construed *in pari materia.* If Section 1982 applies to all discrimination, private and public, federal and state, so then does Section 1981. The Civil Rights Acts should be broadly construed to effect their benign and remedial purpose.

The discussion in *Henry v. Schlesinger,* 407 F.Supp. 1179, 1186–88 (E.D.Pa.1976), is instructive. There, the Court held that Section 1981 prohibits racial discrimination in federal civilian employment. *Accord, Bowers v. Campbell,* 505 F.2d 1155, 1157–58 (9th Cir. 1974). This precise holding cannot survive the Supreme Court's opinion in *Brown v. G. S. A.,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), holding that Title VII of the Civil Rights Act of 1964 is the exclusive remedy for discrimination in federal employment. As we have already seen, Title VII does not apply to the federal military position that plaintiff held here. The 1972 amendments to Title VII are therefore of no use to her, but neither can they have the effect of excluding the pre–existing 1981 remedy. In *Brown* the Supreme Court observed that Congress, when it enacted the 1972 amendments to Title VII, probably believed that federal employees victimized by discrimination had no effective judicial remedy, but the Court also left open the possibility that this understanding of Congress was incorrect. The plaintiff here, since her position as a recruiter was not covered by Title VII, is in a posture legally analogous to that of the congressional employee who brought suit in *Davis v. Passman, supra,* because Congress likewise is not subject to Title VII. In *Davis* the Supreme Court implied a *Bivens* –type constitutional right of action. *Davis* was a case of sex discrimination, so Section 1981, which

is limited to racial discrimination, was not available.

The opinion of the Court of Appeals in *Johnson v. Alexander, supra,* holding Title VII inapplicable to the military, clearly implies that a Section 1981 claim could be stated if sufficient proof of discrimination were made out. See 572 F.2d at 1223. In addition, the opinion of the District Court that *Johnson* affirmed, *Johnson v. Hoffman,* 424 F.Supp. 490 (E.D.Mo.1977), leaves the same impression. Section 1981 was held inapplicable because the plaintiff alleged only a disparate impact, not intentional discrimination.

■ In sum, the question comes down to this: if plaintiff has proved that she lost her recruiter position as a result of deliberate racial discrimination, does she have a judicial remedy? In a society where few policies are as deeply rooted in constitutional jurisprudence as the prohibition against conscious racial discrimination, the answer must be yes. The Court holds that plaintiff's enlistment as a recruiter was a "contract" within the meaning of Section 1981, cf. *In re Grimley,* 137 U.S. 147, 151, 11 S.Ct. 54, 34 L.Ed. 636 (1890), and that the statute was violated if plaintiff's non-renewal was motivated by prejudice against black persons.

■ Defendant, and particularly the intervenor United States, suggested from time to time during the second phase of the trial that plaintiff's claim might be barred by failure to exhaust administrative remedies. If the claim were based upon Title VII, or even on a *Bivens*–type implied constitutional right of action, *see Bishop v. Tice, supra,* this argument might have merit, but the Court is aware of no authority to the effect that actions to enforce the Civil Rights Acts of 1866, 1870, and 1871 are subject to an exhaustion requirement. The defense witnesses, moreover, though they

talked a good deal about internal complaint procedures, were never able to describe clearly what those procedures were. Even the present equal opportunity officer at the Arkansas National Guard, when pressed, could not explain exactly how Ms. Taylor might have pursued her complaint within the military. And in any event, Ms. Taylor raised her complaint verbally through the chain of command to the extent practicable, all without result. She complained to her superior officers of racial discrimination in the non-renewal of her recruiting appointment. They told her nothing helpful. Specifically, they did not explain to her how to make any further complaints in writing. Colonel Burdell, the highest–ranking person with whom Ms. Taylor discussed her problem, simply arranged for her to take the lesser–paying mail–room clerk job, instead of processing, or even rejecting on its merits, her claim of racial discrimination. Even if there were an exhaustion requirement, Ms. Taylor did everything that could be reasonably expected of her to bring her complaint to the attention of military authority within the Arkansas National Guard. Any further action on her part would have been futile, and would probably have resulted in her losing even the job of mail–room clerk.[2]

On the question of deliberate discrimination, of course, plaintiff bears the burden of persuasion. The Court finds that she has met it. The Court particularly credits the testimony of Sandra Fletcher Williams, a white woman who was a recruiter between December 1, 1973, and April 30, 1975. Her tour of duty in this position thus encompassed the full 90 days of plaintiff's service in a recruiting capacity. Like plaintiff, Ms. Williams was placed on recruiting duty only temporarily, but the understanding was that if her work was satisfactory, she would be renewed. Ms. Williams was in fact re-

---

**2.** The testimony of Sammy Hood, a black Sergeant First Class in the Arkansas National Guard, now an equal opportunity specialist in the Thirty–ninth Brigade, is relevant at this point. Sergeant Hood, on one occasion, did complain of racial discrimination to an inspector general, apparently a high–ranking officer in the United States Army. The general re-

plied, Mr. Hood said, that "if I wanted a promotion, I should take the colonel to dinner." The reply was at best a poor joke, hardly the serious reaction to a serious charge that Sergeant Hood was entitled to expect. The current governing regulation appears to be National Guard Reg. 600–23, dated Dec. 30, 1974.

newed on July 1, 1974, the precise time when plaintiff's recruiting appointment was terminated. Ms. Williams's and Ms. Taylor's superior, Sergeant Carl Lee (Bo) Howell, expressed viewpoints against black people. He made improper sexual advances both to Ms. Williams and to Ms. Taylor. He told Ms. Williams that he would determine whether she got her renewal. Ms. Williams was renewed, though she did not submit to Sergeant Howell. Ms. Taylor was not. According to Ms. Williams, who was familiar with the situation at the time and who has no motive to fabricate, Sergeant Howell and his superiors terminated Ms. Taylor, and transferred her to the mail–room clerk position, because she had made a complaint of racial discrimination and was going to make trouble. The Court finds it significant that the white woman who resisted Sergeant Howell was not terminated, that Sergeant Howell was known to have anti-black feelings, and that Ms. Taylor's performance as a recruiter was satisfactory. The fact that Sergeant Howell, although he is still an employee of the Arkansas National Guard, was not called to testify at either trial, speaks volumes. The Court can infer only that the Sergeant's testimony would not have been favorable to the defendant.

In an effort to justify what happened to Ms. Taylor, defendant has proffered a number of explanations, not all of them consistent. At the first trial, for example, it was said that Ms. Taylor was terminated because of the unavailability of funds, but this explanation cannot be squared with the fact that Ms. Williams and others were kept on. At the second trial, Colonel William A. Cook, now operations, plans, and military support officer for the Arkansas National Guard, first stated that he made the decision not to renew Ms. Taylor as a recruiter, and then stated that he had made no individual decision not to renew her, and that her tour of duty as a recruiter had simply expired. The strong inference of discrimination from the factual setting, some of which has been detailed in this Court's prior opinions, the direct testimony of Ms. Williams, and the contradictory justifications put forward by defendant, all combine to cause this Court to find that Ms. Taylor's

non–renewal was based upon her race, and that the discrimination against her was conscious and deliberate. Her non–renewal therefore violated 42 U.S.C. § 1981.

## III. REMEDY

### 1. Back Pay

■ Plaintiff is entitled to be made whole, in financial terms, for the wrong done to her. According to Exhibit 4 submitted with plaintiff's Memorandum on Relief and Remedies, filed on March 4, 1980, plaintiff's actual earnings from 1974 through March 31, 1980, have been $39,-899.37. This figure is not disputed by defendant, and the Court accepts it as a predicate for the computation of back pay. The more difficult question is what Ms. Taylor would have earned had she not been unlawfully deprived of the position of recruiter. Plaintiff takes the position that the most nearly comparable employee is Dorothy Hayner, and the Court agrees, but it cannot be assumed that plaintiff would have received the same promotions, through the years, that Ms. Hayner received. This Court has previously held that the computation of back pay as if a plaintiff would have been promoted to a higher-paying job is too speculative. *Taylor v. Teletype Corp.*, 478 F.Supp. 1227, 1229 (E.D.Ark.1979), *final judgment entered*, 492 F.Supp. 405 (1980), *appeals pending*, 8th Cir., Nos. 79–2027, 80–1658, 80–1681.

■ At the same time, it can hardly be doubted that plaintiff would have received some increases in pay. Her pay for the recruiting position in 1974, had she remained in it throughout the year, would have been $6,693.57. Cost–of–living increases alone would have caused this yearly salary to increase substantially between 1974 and 1980, entirely apart from promotions. The Court believes that the fairest approximation to the correct amount of back pay can be obtained by allowing a six per cent cost–of–living increase for each year. When this factor is applied, the following putative yearly salaries for Ms. Taylor are obtained: 1975, $7,095.18; 1976, $7,520.89; 1977, $7,972.14; 1978, $8,450.47; 1979, $8,957.50; the first three months of

1980, $2,373.74. On this basis, the Court finds that Ms. Taylor would have earned, had she not been unlawfully terminated, $42,369.92. If from this figure her actual earnings of $39,899.37 are subtracted, a back-pay award of $2,470.55 results, and judgment will be entered for this amount.

### 2. Reinstatement

Reinstatement is a normal incident of individual relief granted to successful racial-discrimination employee plaintiffs. The present case, however, is unusual in several respects. For one thing, as noted above, plaintiff's recruiter position was an active–duty military post, and this Court is loath to intervene in matters of military assignment. In addition, defendants claim that National Guard Regulation 600–200, which in general bars enlistment in the National Guard of single parents with custody of children under 18, would prohibit them from accepting Ms. Taylor as a guard member, which she would have to be if she is to become a recruiter again. Plaintiff replies that the regulation has disparate impact on women, which it clearly does, and that therefore it should not be given effect to prevent her reinstatement. The Court finds it unnecessary to reach this issue. In deference to the customary leeway given by civilian courts to military authorities, this Court will not require that Ms. Taylor be reinstated as a recruiter. Instead, defendant will be given a choice: he may either reinstate Ms. Taylor as a recruiter, or give her a comparable civilian job, either federal or state. By "comparable" is meant a job roughly equivalent in pay, benefits, status, and responsibility to a recruiting position paid at the 1980 level as computed above.

### 3. Affirmative Equitable Relief

Plaintiff requests, in addition, that the Court impose a hiring plan on defendant with respect to both federal and state employees. Plaintiff asks the Court to require, among other things, that one out of every two employees hired by defendant must be black, until a certain ratio is reached, either 16 per cent, which is the percentage of blacks in the general population in Arkansas, or 23 per cent, which is the percentage of blacks among members of the Arkansas National Guard. Defendants resist this request, contending first that the Court lacks power to impose any such relief because this is not a class action, but only an individual claim brought by Corenna Taylor. In addition, defendants, especially the intervenor United States, assert that affirmative relief should in any event be limited to state employees of the Guard, since Ms. Taylor was never a federal employee. It is suggested, in fact, that plaintiff lacks standing to request relief in respect of future hiring of federal employees.

In order to deal with these contentions, it is necessary to place plaintiff's individual claim in context. At the end of the first phase of the trial in this case, the Court found that the racial atmosphere in the National Guard was "dismal," and the basis for this finding will not be repeated here. A good deal of testimony was received, however, at the second phase of the trial on this question of racial atmosphere, and it is therefore appropriate now to turn to this issue of fact. Defendants claim that the racial atmosphere in the Guard has much improved. A number of witnesses testified on both sides as to this point. Some of the testimony was conflicting. The Court finds that the racial atmosphere in the Arkansas National Guard is still far below that civilized and decent respect for co-workers that both the State and its citizens are entitled to.

In this respect, the Court credits the testimony of Ira A. Blueford, Jr., Glenda C. King Pruitt, Sammy Hood, and Roosevelt Smith, Jr. Ms. Pruitt's evidence is particularly relevant, since it concerns a very recent time period. This witness was harassed by racial jokes, was physically insulted by white co–employees, and was approached by one white co–employee who told her that he was a member of the Ku Klux Klan and that she would have to accept being called a "nigger."[3] Ms.

---

**3.** Citizens, including members or employees of the Arkansas National Guard, have a First Amendment right to join the Ku Klux Klan, so long as their activities do not involve violence

Pruitt's tour of duty ended on March 4, 1980. She had expressed interest in applying for a technician's job, but a white supervisory employee told her that a black woman could not hope to get such a job.

Statistical evidence is important here, also. There are 90 armories in Arkansas, most with only one person in charge. These employees, who are all federal technicians, are called Administrative Supply Technicians (AST). Of the more than 90 ASTs in the Arkansas National Guard, only one is black. The Guard adopted an affirmative action plan as long ago as 1971, and under the plan proportionate representation of blacks was supposed to be attained within a reasonable time. Not only has the proportion not been attained, there has been no appreciable progress towards it. Colonel James A. Ryan, Chief of Staff of the Arkansas National Guard, was unable to give a reason for this lack of progress. When job openings are announced, a screening board composed of three persons is impaneled to consider applicants. During the entire history of the Arkansas National Guard, according to Colonel Ryan, only one black has been a member of the screening board. Blacks are seriously underrepresented in the Guard, the Colonel added. He saw no reason that would preclude an order requiring some degree of racial balance in the Arkansas National Guard.

This is not to say that there has been no improvement. There are officers and employees of good will in the Guard, including Col. John Zanoff, whose testimony was impressive to the Court. In addition, a few black persons, civilian and military, are slowly being placed in managerial positions. When Nathaniel McGee first joined the Guard in 1971, for example, he was actually forced to eat by himself. He was the first black in the Brinkley, Arkansas, unit. He had originally wanted to become a member of the West Memphis unit, but "when I tried to get in that unit it was a joke." McGee, now a First Lieutenant, testified that in his unit the current racial atmosphere is basically good. It is important to note, however, that most of the people with whom Lieutenant McGee works hold a rank of captain or above, and awareness of the importance of good race relations appears to be much greater among higher-ranking officials. Even now, all of the decisionmakers in the Guard in Eastern Arkansas are white, with the exception of Lieutenant McGee, and there are still some serious problems. White employees, for example, have refused to accept direction from Lieutenant McGee, and this difficulty is racially based. The Court agrees with Lieutenant McGee's assessment that as the environment approaches a fairer racial representation, the degree of racism tends to diminish.

In this situation, it is unrealistic to treat Ms. Taylor's individual claim in a vacuum. Discrimination in the Guard has been pervasive and has only recently, partly under the pressure of this suit, begun to dissipate. To reinstate Ms. Taylor in a work atmosphere only somewhat improved from the appalling conditions that obtained in 1974 would do little good, either for her or for the Arkansas National Guard, in the long run. She has standing not only to seek reinstatement, but to seek to be reinstated in a work place where all people are treated with decency and respect. The Court finds that this goal will be materially impeded unless the Arkansas National Guard is required to step up its employment of qualified black persons. It is true that Ms. Taylor was never a federal employee, but this circumstance is not material. Federal employees work side by side with state employees, sometimes performing similar tasks. All employees of the Guard, federal and state, are subject to the supervisory authority of the Adjutant General and federal employees are entitled to the same

---

or incitement to violence. It does not follow, however, that members of this organization are entitled to propagate their beliefs during working hours and on state time, certainly not when those beliefs involve an animus against a certain class of co-workers. The incident recounted is not the only one involving Klan activity by members of the Arkansas National Guard. The Court does not attribute the motives and purposes of the Ku Klux Klan to the defendant Jones, but racial harassment and prejudice have been part of the atmosphere in the Arkansas National Guard so long that no Adjutant General could be unaware of it.

protection from racial discrimination as state employees, though the legal source of the protection varies. The fact that different sections of Title VII apply to federal and state employees is not sufficient to justify limiting relief to the latter group.

 As noted above, this is not a class action, but affirmative equitable relief, in the special circumstances of this case, should not be regarded' as peculiarly class relief. No request has been made that back pay be given to any person other than Ms. Taylor, nor is reinstatement of any other discharged employee being considered. (Other suits by other employees, still to be adjudicated, do make such requests.) The affirmative equitable relief at issue here is purely prospective, and will have the effect both of improving the racial atmosphere at the Guard and of benefiting unknown future applicants for employment. It is customary for courts, even in individual actions, to award broad injunctive relief forbidding future discrimination. So here, where the aggravated character of the evidence justifies affirmative relief, and where that relief is necessary to create a work place in which black people can maintain their self-respect, it is no bar to the granting of such relief that plaintiff has never been certified as a class representative.

This reasoning is supported both by the historic role of courts of equity, and by Title VII itself. As the Supreme Court said in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975):

. . . it is the historic purpose of equity to "secur[e] complete justice," *Brown v. Swann*, 10 Pet. 497, 503 [9 L.Ed. 508] (1836); see also *Porter v. Warner Holding Co.*, 328 U.S. 395, 397–398 [66 S.Ct. 1086, 1088–1089, 90 L.Ed. 1332] (1946). "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v. Hood*, 327 U.S. 678, 684 [66 S.Ct. 773, 776, 90 L.Ed. 939] (1946). Title VII deals with legal injuries of an economic character occasioned by racial or other antiminority discrimination. The terms "complete justice" and "necessary relief" have acquired a clear meaning in such circumstances. Where racial discrimination is concerned, "the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154, [85 S.Ct. 817, 822, 13 L.Ed.2d 709] (1965).

 Section 706(g) of the Civil Rights Act of 1964 is especially significant here. That section, 42 U.S.C. § 2000e–5(g), provides in pertinent part:

(g) If the Court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the Court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice) or any other equitable relief as the Court deems appropriate.

The statute is not limited to class actions. It applies in individual actions as well and is clear authority for the power of a court of equity, in its discretion, to order affirmative hiring. Possibly such authority might be lacking in the absence of proof of intentional discrimination. Section 706(g), by its terms, applies only in such aggravated cases. As has been seen, this is such a case. Both the violation of Title VII with respect to the mail–room clerk position, and the violation of 42 U.S.C. § 1981 with respect to the recruiter position, were intentional. Surely the scope of relief available when Section 1981, a statute enacted to enforce the Constitution, is violated, is no less than that available for a violation of the Civil Rights Act of 1964.

 It should be recalled, furthermore, that actions under Title VII and Sec-

tion 1981 have an important public purpose—the eradication of racial discrimination, which is both unfair to affected individuals, and degrading to society as a whole. The Supreme Court itself has described a plaintiff in a case brought under the Civil Rights Act of 1964 as "a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) (per curiam) (footnote omitted). Actions to enforce this statute and cognate provisions of law take on a public character. It does not matter whether the plaintiff is an individual, a class representative, the Equal Employment Opportunity Commission or the United States. If the proof shows a broad–ranging pattern and practice of racial discrimination, as it does here, the courts are empowered, indeed obligated, to fashion effective equitable relief. See *Gregory v. Litton Sys., Inc.*, 472 F.2d 631 (9th Cir. 1972), strongly implying that injunctive relief benefiting persons other than named parties may be granted in individual actions, if an employer is "shown to have a history of discrimination, or an intent to discriminate, . . . ." *Id.* at 633. *Cf. United States v. Sheet Metal Workers Local 36*, 416 F.2d 123, 132 (8th Cir. 1969) (court of equity may impose affirmative relief even if no identified persons have been discriminated against), cited with approval in *Carter v. Gallagher*, 452 F.2d 315, 330 (8th Cir.) (en banc), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

■ What relief, then, should be granted? The Court must tailor the remedy carefully, so as to avoid imposing unreasonable burdens on defendant. Racial quotas are philosophically abhorrent to the Court, but the proof here leaves no choice. There is simply no other way to ensure that the law will be complied with in the future. Colonel James Ryan, the Arkansas National Guard Chief of Staff whose testimony has been referred to earlier, frankly stated that he couldn't guess how long it would take the Guard to bring the ratio of black employees up to 16 per cent if it were left alone. The Court is aided in this regard by representations made by defendant in his Memorandum on Relief and Remedies filed April 10, 1980. At p. 5 of this document, defendant suggests, as a reasonable employment goal with respect to state employees, that one out of every three new employees hired by the National Guard should be black until a 16 per cent level is achieved. This formula is the fairest solution for all sides, and it will be incorporated in the judgment. It is true that defendant has been operating for some months under an interim injunction requiring that one out of every two new employees be black. After hearing all the evidence, and attempting to weigh the equities on both sides, the Court finds that a one out of three hiring requirement, with a goal of 16 per cent, is appropriate. Some of the jobs at issue here require specialized skill, and a 23 per cent hiring goal would probably not fairly reflect the labor pool of qualified persons available. Defendant could have aided the Court substantially by introducing specific evidence as to available applicants for various kinds of skilled jobs. No such evidence was introduced. The Court nevertheless agrees that a 23 per cent hiring goal would be so high as to be unfair to defendant. In this regard, it is significant that counsel for plaintiff themselves initially suggested a 16 per cent figure.

■ The judgment will include not only this affirmative hiring requirement, but also a direction that defendant keep records, by race, of all persons who apply for jobs, all persons who are not hired, and all persons who are hired. If a specific job opening occurs for which, after diligent affirmative effort, no qualified black person applies, defendant may apply to the Court for relief, which will be granted if a sufficiently persuasive showing can be made. Plaintiff's other requests for relief, with the exception of attorney's fees and costs, which will be discussed below, are denied. Prejudgment interest would not be appropriate here because the amount and nature of defendant's liability did not become clear until the conclusion of the trial. The imposition of punitive damages under 42 U.S.C. § 1981 is not necessary to vindicate the policy of the statute. Plaintiff asks the

Court to create an affirmative–action committee to superintend the Guard's hiring practices, and to direct that a new affirmative–action plan be prepared. These requests are denied. The Court has little faith in plans and committees. What counts is action.

#### 4. Attorneys' Fees and Costs

■ Plaintiff is the prevailing party within the meaning of 42 U.S.C. § 1988. She is therefore entitled to recover her attorneys' fees and costs, unless special circumstances make such a recovery inequitable. There are no such circumstances here.

Plaintiff has been represented, from time to time, by four attorneys, John W. Walker, Richard Quiggle, Ralph Washington, and Henry L. Jones, Jr. There has been no duplication in these attorneys' services. Although Mr. Walker and Mr. Quiggle were both in the courtroom during much of the trial, it is not unreasonable, in a case of this complexity and length, for more than one lawyer to be present on a side. The United States itself had two lawyers present most of the time. Based upon its knowledge of the abilities of these lawyers, and the fees customarily charged in this area, the Court allows attorneys' fees on the following basis: for John W. Walker, $75.00 an hour in court, $50.00 out of court; for Richard Quiggle, who was admitted to the bar three years ago, $40.00 an hour in court, $35.00 an hour out of court; for Ralph Washington, who has been a member of the bar for about two years, $35.00 an hour, all of Mr. Washington's time having been spent out of court; and for Henry L. Jones, Jr., $40.00 an hour. Mr. Jones's time was all out of court, and most of it was several years ago, when attorneys' fees were generally lower.

In accordance with the guidelines customarily applied in this Circuit, these hourly rates, when multiplied by the numbers of hours spent, which are set forth in affidavits, are presumptively a base figure to be awarded by the Court.

To this figure the Court will add a multiplier of 20 per cent, an action that is rarely taken but is appropriate here. This is not a garden–variety Title VII case. It involved issues of unusual complexity and required two separate trials. Counsel for plaintiff were faced with tenacious opposition, not only from the named defendant, but from the Federal Government itself. The results obtained, both for the named plaintiff and for the general citizenry, go beyond the normal. A substantial public benefit to the State of Arkansas should accrue from the relief decreed in this case.

In view of all these factors, the judgment will include the following award of attorneys' fees:

For John W. Walker, Esq.

| | | |
|---|---|---|
| 18 hours in court x $75 | = | $1,350.00 |
| 103.5 hours out of court x $50 | = | $5,175.00 |
| | | $6,525.00 |
| Plus 20% multiplier | | 1,305.00 |
| Total fee | | $7,830.00 |
| Out-of-pocket expenses | | 20.64 |
| Total award | | $7,850.64 |

For Richard Quiggle,

| | | |
|---|---|---|
| 48 hours in court x $40 | = | $1,920.00 |
| 126 hours out of court x $35 | = | $4,410.00 |
| | | $6,330.00 |
| Plus 20% multiplier | | 1,264.00 |
| Total fee | | $7,594.00 |
| Out-of-pocket expenses | | 351.09 |
| Total award | | $7,945.09 |

For Ralph Washington,

| | | |
|---|---|---|
| 14 hours out of court x $35 | = | $490.00 |
| Plus 20% multiplier | = | 98.00 |
| Total award | | $588.00 |

For Henry L. Jones, Jr.

| | | |
|---|---|---|
| 68½ hours out of court x $40 | = | $2,740.00 |
| Plus 20% multiplier | | 548.00 |
| Total award | | $3,288.00 |

These figures do not include any allowance for time or expenses relating to the appeal of this Court's interim injunction. The request for an award of fees and expenses with respect to the appeal should be directed to the Court of Appeals. In addition, no award is made for sums paid to law clerks. The affidavit filed by counsel for plaintiff does not indicate whether the law clerks' research related to proceedings before this Court, as opposed to those before

the Court of Appeals. The fee award goes only against the state defendant.[4]

## IV. QUESTIONS PUT BY THE COURT OF APPEALS

The Court of Appeals' order of June 12, 1980, sets forth four specific issues that this Court is to address: "a) the jurisdictional basis upon which relief has been ordered; b) the extent to which any injunctive relief granted will apply to federal employees and the reasons for such application; c) the reasons for denying the United States the right to present evidence after permitting its intervention; and d) the basis for ordering class relief."

Questions b) and d) have already been discussed. The other two questions will now be addressed.

### 1. Jurisdictional Basis

Defendant has violated 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. The Court has jurisdiction over both these claims under 28 U.S.C. § 1343. Since the amount in controversy exceeds $10,000, jurisdiction exists also under 28. U.S.C. § 1331.

### 2. Presentation of Evidence by the United States

The United States filed its motion for leave to intervene on May 23, 1980, four years after the complaint was filed, and six days before the second phase of the trial was scheduled to begin. The motion was granted on May 29, 1980, at the beginning of the second part of the trial. The United States was not denied the right to present evidence. It called witnesses and offered documentary evidence, all of which the Court heard and has considered. The United States complains (and perhaps this is what the order of the Court of Appeals refers to) that it was prejudiced by the Court's refusal to grant a continuance, which was requested and denied several times. There was no prejudice. The major

reason asserted for the continuance was to enable the United States to meet plaintiff's claim that the Court should cut off federal funds to the Arkansas National Guard under Title VI of the Civil Rights Act of 1964. Since the United States has prevailed on the merits of this claim, it cannot have been prejudiced. The Government was given ample opportunity to present evidence both on the issue of discrimination with respect to the recruiter position, and on the issue of equitable relief. The Government was not present during the first phase of the trial, but it had not asked to be present. The Court allowed the Government to become a party six days after receiving its request, even though the request was not filed until the eve of trial, an indulgence that is not often granted to parties other than the Sovereign. The Government complains that certain witnesses who testified in February were not subject to cross–examination by its counsel. Counsel for the United States could easily have called these witnesses at the second phase of the trial, if they had so desired. One of them, Marcellus Person, was physically present in the courtroom, advising with plaintiff's counsel, throughout most of the second part of the trial.

Judgment will be entered in accordance with this opinion.

## JUDGMENT

In accordance with the opinion filed simultaneously herewith, the Court enters the following final judgment:

1. It is adjudged and declared that the failure to renew plaintiff's appointment as a recruiter was a violation of 42 U.S.C. § 1981, and that the constructive discharge of plaintiff from her position as mail–room clerk was a violation of Title VII of the Civil Rights Act of 1964.

2. Plaintiff shall have and recover of and from the defendant James H. Jones

---

4. Whether a fee award against the United States is barred by sovereign immunity is an open question in this Circuit. See *United Handicapped Fed'n v. Andre*, 622 F.2d 342 at 348 (8th Cir. 1980). The District of Columbia Circuit has held that 42 U.S.C. § 1988 does not waive the sovereign immunity of the United States. *NAACP v. Civiletti*, 609 F.2d 514 (D.C. Cir.1980), *cert. denied*, —— U.S. ——, 100 S.Ct. 3012, 65 L.Ed.2d —— (1980).

judgment in the amounts of $2,470.55, representing back pay; $7,850.64, representing attorneys' fees and costs incurred by her in respect of the services of John W. Walker, Esq.; $7,945.09, representing attorneys' fees and costs incurred by her in respect of the services of Richard Quiggle, Esq.; $588.00, representing attorney's fees incurred by her in respect of the services of Ralph Washington, Esq.; and $3,288.00, representing attorney's fees and costs incurred by her in respect of the services of the Hon. Henry L. Jones, Jr.

3. Defendant Jones is directed to reinstate plaintiff in the position of recruiter, or, at his option, in a comparable civilian job, state or federal, comparability to be judged according to pay, status, benefits, and responsibility.

4. The injunction previously entered by this Court *pendente lite* is dissolved. From and after the date of this judgment, defendant is directed to hire at least one black person for every two white persons employed, in both state and federal positions, until the level of black employees reaches 16 per cent.

5. Defendant is directed to keep records of all persons employed and all persons who apply for employment, by race, these records to be available for inspection at reasonable hours either by the Court or by counsel for plaintiff. Defendant is also instructed to report to the Court on the first day of each calendar quarter, until further order, the names, positions, and race of persons hired.

6. The Court retains jurisdiction for the purpose of enforcing this judgment.

7. Plaintiff's other requests for relief, including prejudgment interest, punitive damages, cessation of federal funding under Title VI of the Civil Rights Act of 1964, the formulation of a new affirmative–action plan, and the appointment of a committee to monitor defendant's compliance with this judgment, are all denied.

8. The monetary awards made by this judgment shall bear interest at the rate of ten per centum per annum from and after the date of entry hereof.

9. No relief is awarded against the intervenor United States of America.

The Clerk is directed to transmit to the Court of Appeals, in accordance with its order of June 12, 1980, this judgment, this Court's opinion of even date herewith, and this Court's entire file in this case, together with his certification of all docket entries.

For all of which let execution issue, at the time and in the manner provided by law.

## APPENDIX A

### ORDER

The injunction entered herein on February 22, 1980, as modified on February 27, 1980, and March 6, 1980, as extended on April 2, 1980, and as further modified on May 9, 1980, is hereby clarified as follows:

The order does not impose (and was never intended to impose) any restraint on defendant or intervenor with respect to military appointments or positions. The order applies only to employees. It applies both to State and to federal employees (usually known as technicians) of defendant. The Court finds that those persons known as CFTMs and AFTMs are federal military persons, not employees. The order therefore imposes no restraint with respect to CFTMs or AFTMs.

The Court has heard all the evidence on the merits. The trial is over. The following findings and conclusions, among others, have been announced (subject to later amplification by way of written opinion):

1. Title VII does not apply to federal military appointments or positions. *Johnson v. Alexander,,* 572 F.2d 1219 (8th Cir. 1978). Assuming *arguendo* that an action under the Fifth Amendment would lie, proof of conscious and deliberate racial discrimination would be necessary. Whether there is such proof here, with respect to the recruiter position, must be considered by the Court. The Court must also decide whether plaintiff's recruiter position was a federal military appointment for present purposes.

2. The request that federal funds be denied to the Arkansas National Guard is denied. Administrative remedies under Title VI have not been exhausted. It would not be equitable on this record to require that funds be cut off, in any event.

3. The Court has found that plaintiff was constructively discharged from her second position, and that, as to this incident, the racial discrimination against plaintiff was intentional. This finding is not changed.

4. Affirmative equitable relief is appropriate with respect to all of defendant's employees, both "federal" and "state." Defendant's discriminatory conduct, and his failure to give any serious attention to affirmative action, have been pervasive and long-continued. The nature of the affirmative relief to be included in the final decree (what hiring goals should be set, for example, and what hiring ratio should be specified) requires more reflection.

5. The Court will endeavor to enter a final decree promptly, including the issue of the amount of counsel fees. The Court finds that plaintiff on the case as a whole is the prevailing party and is entitled to an award of counsel fees.

This Court's order described in the first paragraph of this order, as clarified in the second paragraph of this order, remains in effect *pendente lite* (subject, of course, to the pending appeal). The equities of the case, including the facts shown at the renewed trial, do not, in this Court's opinion, require any change *pendente lite* other than the clarification made above.

IT IS SO ORDERED this 6th day of June, 1980.