Warren LOOPER, Jr. *v.* Melvin THRASH

98-260                                                  972 S.W.2d 250

Supreme Court of Arkansas
Opinion delivered July 16, 1998

*Oscar Stilley*, for appellant.

*Friday, Eldredge & Clark*, by: *R. Christopher Lawson*, for appellee.

DAVID NEWBERN, Justice. This is an illegal-exaction case. Melvin Thrash, the appellee, served as Adjutant General of the State of Arkansas from September 21, 1993, to December 14, 1996. Warren Looper, Jr., the appellant, filed a complaint against Mr. Thrash on February 27, 1997. He alleged that, because Mr. Thrash lost his "federal recognition" upon reaching age 64 on May 1, 1996, Mr. Thrash's acceptance of salary from May to December, as well as his use of a residence at Camp Robinson, known as the "Pike House," at a reduced rental rate during that period, constituted an illegal exaction. Mr. Looper sought to have Mr. Thrash return to the State the salary received from May to December of 1996 and the "reasonable rental value of the Pike House less amounts actually paid thereon." He further sought an order divesting Mr. Thrash "of all benefits and perquisites of his illegal office holding, including but not limited to retirement benefits or credits." The Chancellor granted summary judgment to Mr. Thrash. We affirm.

We have not previously dealt with issues arising from the duality of responsibilities for the National Guard, but we have learned from our study of the state and federal statutes discussed

below, as well as from cases decided in other states, that a state's militia is governed by state law unless it becomes "federalized." While a state's militia remains under a state's aegis, under the control of state officials, its equipment may be furnished by the federal government, and the states strive to achieve federal recognition for their militia units, and their personnel, so that they may be prepared for state or federal service. Perhaps the best explanations of the division of responsibilities between state and federal authorities appear in *Holmes v. California Army Nat'l Guard*, 920 F.Supp. 1510 (N.D. Cal. 1996), and *Taylor v. Jones*, 495 F.Supp. 1285 (E.D. Ark. 1980).

The argument presented by Mr. Looper is based on Arkansas Code Ann. § 12-61-201 (Repl. 1995), which provides:

> (a) The organized militia shall be commanded by a general officer who shall be federally recognized or qualified for federal recognition in a rank not higher than major general.
> (b) He shall be responsible for the military efficiency of the Arkansas organized militia.

Mr. Thrash does not contest the allegation that he lost his federal recognition on May 1, 1996. That was due to 32 U.S.C. § 324(a) (1994), which provides:

> An officer of the National Guard shall be discharged when—
> (1) he becomes 64 years of age; or
> (2) his Federal recognition is withdrawn.
> The official who would be authorized to appoint him shall give him a discharge certificate.

Apparently on the questionable assumption that the "organized militia" is "commanded" by the Adjutant General, Mr. Looper seized upon § 12-61-201 for his argument that Mr. Thrash illegally occupied the office of Adjutant General from May 1 until December 14, 1996. We need not decide in this case whether that is so.

We find nothing in the United States Code that requires that a state's adjutant general be federally recognized to serve in that position. The pertinent (federal) National Guard Regulation, AR 600-100, § 11-3(1), provides, "A State Adjutant General may be appointed and serve in that capacity without Fed-

eral Recognition." That, however, does not end the inquiry on Mr. Looper's argument. Arkansas law must be examined further to determine whether Mr. Thrash's loss of federal recognition made him ineligible to hold the position and, if so, whether his receipt of remuneration as he continued to serve in the position without being replaced by the appointing authority amounted to an illegal exaction.

Arkansas Const. art. 11, § 1, entitled, "Militia," provides:

> The militia shall consist of all able-bodied male persons, residents of the State, between the ages of eighteen and forty-five years, except such as may be exempted by the laws of the United States or this State, and shall be organized, officered, armed and equipped and trained in such manner as may be provided by law.

■ Laws enacted pursuant to art. 11, § 1, are found in Act 50 of 1969 which, in § 46(a), codified as Ark. Code Ann. § 12-60-102(1) (Repl. 1995), provides that the "organized militia" is "the National Guard of the state as defined in 32 U.S.C. § 101(3)." That federal-statute subsection contains only the following definition: " (3) 'National Guard' means the Army National Guard and the Air National Guard." 32 U.S.C. § 101(3) (1994).

"The Governor, by virtue of his office, shall be Commander-in-Chief of the militia, except the parts thereof as are ordered into the service of the United States." Ark. Code Ann. § 12-61-102 (Repl. 1995).

■ Arkansas Code Ann. § 12-61-105(a) (Repl. 1995) provides that "[t]here shall be an Adjutant General of the state who shall be appointed by the Governor and shall be a commissioned officer in the Adjutant General's department of the National Guard of this state and shall have rank not higher than major general." The qualifications are further spelled out in § 12-61-105(b). Section 12-61-105 states nothing with respect to federal recognition.

■ We cannot, however, ignore a statute that has not been cited in this appeal, i.e., Ark. Code Ann. § 12-61-202 (Supp. 1996). It provides:

> The land force of the organized militia shall be the Army National Guard as contemplated under the laws of the United States and shall comprise the army units which are a part of the Arkansas National Guard on February 12, 1969, and such other army units as may be allocated, accepted, and organized thereafter, including the personnel who are enlisted, appointed, or commissioned therein, *provided that all persons who are members of the Army National Guard shall be federally recognized as such*. [Emphasis supplied.]

█ It is thus apparent that, upon the loss of his federal recognition, Mr. Thrash lost his eligibility for membership in the Arkansas National Guard. He was not replaced, however, and continued to act in the position until his resignation on December 14, 1996. As there is no federal law on point, we must examine the Arkansas law applicable to an official who, although qualified upon appointment, loses his qualification but becomes a *de facto* or "hold-over" appointee.

In *Sitton v. Burnett*, 216 Ark. 575, 226 S.W.2d 544 (1950), the Clinton City Council employed Mr. Sitton as marshal even though Mr. Sitton was not a resident or "qualified elector" of that city and was thus ineligible to serve as marshal pursuant to a constitutional provision, a statute, and case law. We affirmed the judgment in favor of the taxpayer who sued to recover the salary paid.

We acknowledged that Mr. Sitton had in essence been a *de facto* officer of the city. We pointed out, however, that, in a prior phase of the case, *Thomas v. Sitton*, 213 Ark. 816, 212 S.W.2d 710 (1948), we had said that a *de facto* officer "is not entitled to the salary provided for the services of city marshal." *Sitton v. Burnett*, 216 Ark. at 576, 226 S.W.2d at 545.

█ We then noted Mr. Sitton's argument that, "since he was concededly a *de facto* officer, had performed the duties of the office of marshal in good faith, and there was no adverse claimant, or *de jure* officer claiming the salary, he, appellant, was entitled to said salary and could not be required to make refund." *Sitton v. Burnett*, 216 Ark. at 577, 226 S.W.2d at 545. We rejected the argument. We said the argument would have been correct but for the statute addressing "usurpation of office," now codified at Ark.

Code Ann. § 16-118-105 (1987). We said that a *de facto* officer qualifies as a "usurper" and that, if there is no person "entitled to the office" to bring suit, the "fees and emoluments" may be recovered "by the State" — apparently through a taxpayer-initiated suit — and "paid into the public treasury." *Id.* In that situation, the fees collected by the usurper "are not his, and he is not entitled to hold them. If he collects any fees for services rendered, he holds them at sufferance." *Id.* at 578, 226 S.W.2d at 546 (quoting *Stephens v. Campbell,* 67 Ark. 484, 55 S.W. 856 (1900)). The *Sitton* case might be controlling here if Mr. Thrash had "usurped" the office of Adjutant General at the outset of his appointment, but that did not happen. Again, no one questions Mr. Thrash's qualifications to serve at the time he was appointed.

*Revis v. Harris,* 217 Ark. 25, 228 S.W.2d 624 (1950)("*Revis I*"), and *Revis II,* 219 Ark. 586, 243 S.W.2d 747 (1951), involved the claim of a taxpayer that Sam Harris, while serving as mayor of Clarksville, illegally held the post of municipal judge and also illegally obtained contracts for himself with the city-owned light and water system. The taxpayer sought, among other things, to recover for the State the money received by Mayor Harris (1) for his work as judge, and (2) on the contracts he made with the city utilities. The case was dismissed, and we reversed in *Revis I* and said that

> if appellant's allegations in his complaint to the effect that appellee [the mayor] had been paid sums of money illegally by the City of Clarksville while acting as Municipal Judge, and for other services, without right or authority of law, were true, appellant stated a cause of action and was a proper party to initiate the suit. *Revis I* 217 Ark. at 29, 228 S.W.2d at 626.

On remand, the Mayor argued that his receipt of money for his work as judge, and for the services "as a laborer for the water and light department," was not illegal. We said that he had effectively made a plea of *quantum meruit. Revis II,* 219 Ark. at 587, 243 S.W.2d at 748. The Chancellor enjoined the Mayor from accepting employment "outside of his duties as mayor" but dismissed that part of the complaint requesting the Mayor to repay the salary he had received for working as a judge and as a utility "laborer." The Chancellor agreed that it had been "illegal," in

light of Ark. Stat. Ann. § 19-909, for the mayor to do this work but reasoned that it would be "unjust and inequitable" to require repayment where the Mayor had rendered those extra services "while acting in good faith." *Id.* at 589, 243 S.W.2d at 749.

We reversed in part and affirmed in part. Citing *Sitton v. Burnett, supra,* we required the Mayor to repay the salary he had earned for his work as municipal judge and observed that the mayor had not been a *de jure* judge in light of the statute prohibiting dual office-holding. Thus, we reversed on that point.

We affirmed on the question whether the mayor should repay the salary earned through his work on the contracts he made with the city utilities. On that issue, we conceded it had been illegal for the mayor to do that work but agreed with the argument that "the payee may retain the *quantum meruit* value received for services rendered even when there is a violation of the said section." *Id.* at 590, 243 S.W.2d at 750. We said that the statute rendering that labor "illegal" did not make the contract "null and void," and we further suggested that the contract had been performed in "good faith." *Id.*

We did, however, require repayment of the money received for service as municipal judge and wrote in *Revis II* that the *Sitton* decision required return of the funds received illegally by Mr. Harris "as an officer." Again, it was illegal for Mr. Harris to enter upon the office of municipal judge while he was mayor. *Revis II* was not a case in which the officer was qualified upon entry but lost his qualification later.

In *Starnes v. Sadler,* 237 Ark. 325, 372 S.W.2d 585 (1963), we rejected the plaintiff's claim that dual office-holders were required to repay the salary they had received through the improper "second" office. We noted that there was "nothing in the record to justify a finding that appellants have acted with any fraudulent intent, or that they have even appreciated the possibility of their holding illegal offices. Under the circumstances, those appellants should not be required to account for funds received for services rendered and expenses incurred as Members of the involved State Boards." *Id.* at 331, 372 S.W.2d at 588.

We expressed a similar view in *Martindale v. Honey*, 261 Ark. 708, 551 S.W.2d 202 (1977). There, a legislator held the office of deputy prosecuting attorney in violation of a constitutional provision that prohibits a member of the General Assembly from holding another state office. The legislator argued that "he had in good faith performed the duties" of deputy prosecutor and won summary judgment. *Id.* at 709, 551 S.W.2d at 203. We affirmed, quoting the *Starnes* opinion, and said that the State could not receive a "windfall" in light of the deputy prosecutor's "good faith performance." *Id.* at 710, 551 S.W.2d at 203. *But see Mackey v. McDonald*, 255 Ark. 978, 984, 504 S.W.2d 726, 732 (1974)(stating "fraud or bad faith" need not be shown in illegal-exaction cases; "A good faith misapplication of funds in a manner or for a purpose not authorized by law constitutes an exaction from the taxpayers which is illegal even though not fraudulent.").

While our cases thus suggest that one who enters upon an office "illegally" may be liable to an illegal-exaction claim, we have no case dealing with an illegal-exaction claim against an officer who, although qualified at the time of appointment, as in this case, continues to serve after losing his qualification. Cases decided in other contexts are, however, helpful.

■ In *May v. Edwards*, 258 Ark. 871, 529 S.W.2d 647 (1975), an alderman was convicted of a crime and was replaced. The conviction was reversed, and upon remand, the charge was dismissed. The alderman sued his replacement and claimed that his office had been usurped. The issue on appeal was whether the complaint stated a cause of action. We held that it did and wrote:

> We have said that an office does not *ipso facto* become vacant when a condition of ineligibility of the incumbent arises after he takes office, if he was eligible when he took office, and the subsequent ineligibility merely affords grounds for removal. *Stafford v. Cook*, 159 Ark. 438, 252 S.W. 597 [1923].

*May v. Edwards*, 258 Ark. at 876, 529 S.W.2d at 651.

■ That decision was consistent with our earlier holding in *City of Berryville v. Binam*, 222 Ark. 962, 264 S.W.2d 421 (1954). In that instance, Mr. Binam, the Berryville City Marshall, did not seek reelection to the position, and the person elected to succeed

him failed to qualify. Mr. Binam continued in the office as a "hold-over." The Berryville City Council had purported to reduce the city marshall salary from $100 to $1 per month. Mr. Binam was paid the monthly $1 during the time he held over in the position. He sued the City for the $100 monthly salary allegedly owed to him during the hold-over period. A statute, Ark. Stat. Ann. § 19-1103, specifically provided that a city marshall "shall continue in office until his successor is elected and qualified." We held that he was entitled to the $100 per month. We did not limit our discussion of the law to the statute but said the following:

> An officer who holds over and continues to perform the duties of his office after expiration of his term is entitled to compensation up to the time he ceases to discharge his duties. 62 C.J.S., Municipal Corporations, § 529; McQuillin, Municipal Corporations (3rd Ed.) § 12.202. The period of holding over in such cases is as much a part of the officer's term of office as the regular period fixed by law. 67 C.J.S., Officers, § 48c; McQuillin, Municipal Corporations, (3rd Ed.) § 12.110.

222 Ark. at 964-65, 264 S.W. at 423. Although it may quite properly be said that our remarks beyond the citation of the statute were *obiter dicta*, we read them as an expression of the common law on the matter of persons who enter upon public office when qualified to do so but who lose their qualification and continue in the office with the acquiescence of the appointing authority until resignation or replacement.

■ There being no state or federal law to the contrary, and in view of our expressions in the *May* and *Binam* cases, we hold that Mr. Thrash did not occupy the office of Adjutant General illegally between May 1 and December 14, 1996. Thus, there was no illegal exaction.

Affirmed.

GLAZE and IMBER, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. This is an illegal-exaction case brought pursuant to Article 16, Section 13, of the Arkansas Constitution. It is not an ouster or usurpation case. As such, I do not understand the majority's reliance on cases such

as *City of Berryville v. Binam*, 222 Ark. 962, 264 S.W.2d 421 (1954), which involve whether a vacancy was created in an office.

If the majority is suggesting that a vacancy must be created in an office before salary paid to that officer may be recovered in an illegal-exaction claim, that is not a requirement that I can find expressed in our illegal-exaction cases. "This court has held that one who holds a public office illegally may be required to pay back money received as salary." *Beshear v. Ripling*, 292 Ark. 79, 728 S.W.2d 170 (1987) (citing *Revis v. Harris*, 219 Ark. 586, 243 S.W.2d 747 (1951)). For example, in *Revis, supra*, we recognized a viable illegal-exaction claim that was based on dual office holding, while in *Hensley v. Holder*, 228 Ark. 401, 307 S.W.2d 794 (1957), salary paid to a deputy sheriff was recoverable given that the salary was authorized by unconstitutional local legislation. Neither case couches its illegal-exaction holding in terms of vacancy or usurpation. *Binam*, and similar cases, are simply not on point.

In any event, the proposition in *Binam* that an officer who holds over and continues to perform the duties of his office after expiration of his term is entitled to compensation up to the time he ceases to discharge his duties, is mere *obiter dictum* because a statutory provision providing for holdover was present in *Binam*. And, this common-law holdover proposition is exclusively in the context of municipal-office holders. Notably, there is no statutory provision in the present case providing for any holdover.

Here, Melvin Thrash was obviously ineligible to continue serving as Adjutant General once he was discharged pursuant to federal law. My view is simple. It logically follows that Thrash held the office "illegally" once he was ineligible to serve in that office. To the extent that the trial court granted summary judgment to Thrash because no vacancy was created in the office, or because Thrash was a "*de facto* officer," I would hold that it erred. For purposes of this appeal, I would further proceed to the issue of Thrash's good-faith defense, and whether such a defense is even available under these circumstances. For the forgoing reasons, I respectfully dissent.

GLAZE, J., joins this dissent.