Herman E. CALCOTE

v.

**TEXAS EDUCATIONAL FOUNDATION,**
**INC., d/b/a Gary Job Corps Center.**

Civ. A. No. SA 75 CA 38.

United States District Court,
W. D. Texas,
San Antonio Division.

June 22, 1976.

Luis M. Segura, San Antonio, Tex., for plaintiff.

Ivan D. Hafley, Austin, Tex., for defendant.

CLARY, District Judge.

## OPINION

### FINDINGS OF FACT

1. Plaintiff, Herman E. Calcote, is a Caucasian male and was employed by the defendant, Texas Educational Foundation, Inc., at its Gary Job Corps Center at San Marcos, Texas.

2. Defendant is a non-profit corporation with headquarters and principal place of business in San Marcos, Texas and, at all times relevant to this law suit, was an employer engaged in an industry affecting commerce employing more than twenty-five persons. Defendant operates the Gary Job Corps Center to provide academic and vocational training for under-privileged youths.

3. Plaintiff was hired by the defendant on September 7, 1971, as a residential counselor for the Gary Job Corps Center. When he was interviewed for the job by Michael Flores, Assistant Personnel Director, Calcote was told that the salary would be $950 per month, but at the time he reported for work and filled out papers for the personnel office, he learned that his monthly salary would be $900. Flores was unable to explain this change, but Calcote accepted the lower pay and went to work.

4. Calcote's job responsibility as a residential counselor was to work in the evenings usually 1–10:00 P. M. assisting corpsmen with their studies, resolving personal and behavioral problems, and maintaining discipline. A residential counselor's work began outside the classroom after the corpsmen had completed their vocational and academic training, and residential counsel-

ors were involved with the corpsmen in their dormitory or residential areas.

5. Vocational counselors worked primarily at training corpsmen for vocations or by assisting corpsmen with academic pursuits. Vocational counselors also functioned like public school guidance counselors and engaged in placement, job interviewing, and testing of corpsmen. The hours of work for vocational counselors were 8:00 A. M. to 4:00 P. M.

6. David Glover, an Assistant Area Manager who supervised a residential area and worked with and supervised Calcote at the Gary Job Corps Center, testified that Calcote had the responsibility of taking care of any problems that arose among counselors and corpsmen, for example, making corpsmen understand why a supervisor was punishing them, dealing with any infractions, breaking up fights, or disposing of drug problems. Wilton E. Lomax, who worked both as a vocational and residential counselor, stated that a residential counselor was like a truant officer or a cop. The opinion of both Glover and Lomax was that vocational counseling was an easier job than residential counseling, because 1) the former was a day time, desk job while the latter was a night time job with many more problems of supervision and 2) the residential counselors might be called after hours.

7. Ben Wilson, Jr., a Director of Residential Living and for a time plaintiff's supervisor, testified that more training was required for a vocational counselor's job than for a residential counselor's job. Neither job, however, required a Master's Degree.

8. Pursuant to defendant's "Salary Administration Policy & Guides," vocational counselors were paid under a Progression Schedule which took into account academic degrees and years of experience, including either teaching experience or working in a vocation. Under the same salary policy, residential counselors were paid according to a Classified Merit Positions schedule and were placed in a salary group identified as E–5 with a monthly salary range of $725 to $1,040. According to the Salary Policy, each employee within a Classified Merit Position group was to receive a salary within the range "in proportion to both internal and external job value for assigned duties and responsibilities." The procedure under the salary guides also was that "[n]ew employments should normally be paid at the minimum salary of the appropriate schedule or salary range applicable for the initial job assignments."

9. At the time he was hired, plaintiff, Herman E. Calcote, had a Bachelor of Arts degree, a Master of Education degree, a Teaching Certificate for a counselor, and 13 years teaching and counseling experience. Calcote was hired as a residential counselor under the E–5 grouping of the Classified Merit Positions with beginning salary of $900 per month.

10. At the time he was hired on August 16, 1971, Archie David, a black male, had a Bachelor of Science degree, a Master of Education degree, a Teaching Certificate for a counselor and 10 years teaching experience. Archie David was hired as a vocational counselor under the Progression Schedule and group I–10 and was paid a beginning monthly salary of $950.

11. At the time of his hiring on August 16, 1971, William Krieg, a Caucasian male, had a Bachelor of Arts degree, a Master of Education degree, and six years of previous counseling experience with defendant. Krieg was hired as a vocational counselor in group I–10 of the Progression Schedule and was paid a beginning monthly salary of $950. Krieg became a Master Counselor in 1972.

12. Alan Black, a black male, was hired on September 13, 1971, as a residential counselor in group E–5 under the Classified Merit Positions schedule and started at a monthly salary of $800. Black had a Bachelor's degree and a Master of Education degree, but no professional experience.

13. At the time of plaintiff's hiring, Eldon K. Shipp, a Caucasian male, was employed as a vocational counselor in group I–10 of the Progression Schedule and was earning $950 per month. Shipp had a Bach-

elor of Science degree, a Master of Education degree, a Texas Counselor's Certificate, over six years counseling experience at the Texas Educational Foundation, and 10 additional years counseling experience.

14. Jesse A. DeShay, a black male, was employed by defendant in 1965, was made a residential counselor in July 1971, and was given at that time a monthly salary of $983 in group E–5 under the Classified Merit Schedule. DeShay had a Bachelor of Arts degree and at least 10 years teaching experience prior to 1965. DeShay received an increase on November 22, 1971, to $1,025 per month.

15. On July 17, 1972, defendant eliminated the different positions of Vocational and Residential Counselor and merged them into one job classification called simply Counselor. The new position was assigned the pay level E–5 of the Classified Merit Schedule, but former Vocational Counselors retained their salaries under the Progression Schedule.

16. After the reclassification, all counselors were eligible under the Classified Merit Schedule for annual merit pay increases that could be as high as 8% of their base salary. The frequency and amount of these merit increases was to depend predominantly upon an employee's annual performance evaluation.

17. The counselors at Gary Job Corps Center received the following numerical evaluations and pay raises:

| Name | National Origin/Race | Appraisal | % Pay Raise |
|---|---|---|---|
| Shipp, Eldon K. | Caucasian | 4.9 | 8.0 |
| McFarling, Daniel | Caucasian | 4.8 | 5.0 |
| Krieg, William B., Jr. | Caucasian | 4.6 | 8.0 |
| Nelson, Jerry | Caucasian | 4.5 | 5.0 |
| Johnson, William R. | Caucasian | 4.4 | 7.1 |
| Calcote, Herman E. | Caucasian | 4.3 | 5.0 |
| Crayton, Willie L. | Black | 4.3 | 5.0 |
| Marshall, Roy | Caucasian | 4.1 | 5.0 |
| Pollack, Elvin L. | Caucasian | 4.0 | 8.0 |
| David, Archie C. | Black | 4.0 | 6.0 |
| Peacock, Robert L. | Caucasian | 3.8 | 5.0 |
| Byrd, Cleo L. | Black | 3.2 | 5.0 |

18. The average numerical appraisal for all Caucasians was 4.38, and the average for all blacks was 3.83. The average pay increase for Caucasians was 5.9% and for blacks was 5.3%.

19. Plaintiff was given a 5.0% pay increase after having been recommended for a 6.0% increase by his supervisor Ben wilson, Jr. The change of the salary recommendation from 6.0 to 5.0% was initialed by Ed Welke, a Caucasian male and Director of Personnel. While salary recommendations were approved by the Personnel Director, final authority for pay increases was vested in the Center Director, Noble Butler, a black male.

20. Plaintiff learned that a black counselor, Archie David, was being paid a larger salary and had received a greater merit increase than Calcote while being evaluated at a lower level. Calcote complained to Michael Flores, Assistant Personnel Director, and to his supervisor, Ben Wilson, Jr. Neither of these men was able to explain to Calcote the reason for the difference in the merit increases.

21. After plaintiff complained to his supervisor and to the Personnel Director of the higher salary being paid to Archie David, the salary of Archie David was decreased from $1,007 to $957 per month. Plaintiff was receiving $945 per month at the time of this change.

22. Plaintiff testified that he believes Ras Dancy, a black male appointed to replace Ben Wilson, Jr. as Director of Residential Living and supervisor of counselors,

probably harassed Calcote in retaliation for the latter's complaints over pay.

23. Calcote testified that at the time Ras Dancy was appointed to replace Ben Wilson, Jr., as Director of Residential Living all of the counselors met to compose a testimonial letter for Wilson to help him get another job. When Dancy appeared at a later meeting of counselors, the new supervisor allegedly ridiculed the counselor's meeting as being an "underground meeting" and asked the counselors if they "wanted to bitch." Calcote testified that he then rose and responded to Dancy saying that they owed him no apology, because they had held a meeting of 30 professionals to write a letter for Ben Wilson and had not held an underground meeting.

24. Plaintiff testified that Ras Dancy constantly tried to frustrate and to harass Calcote and that Dancy talked down to him and to other Caucasian counselors but not to black counselors. Calcote stated that Dancy upbraided him for mistreating one of the corpsmen, but the incident had occurred many months before Dancy became his supervisor. According to Calcote, Dancy also wrote a deficiency report that was placed in Calcote's personnel file. In this deficiency report, Dancy allegedly wrote that Calcote had been seen off base during working hours. Calcote testified that he tried to get the report removed from the file, that he told Dancy it was a mistake, that Dancy promised to check out his story, but that Dancy never did anything about it.

25. Wilton Lomax, a vocational counselor and a Caucasian male, was supervised by Ras Dancy and stated that in his opinion Dancy was a racist and that Dancy tried to cut down white people. Lomax testified that he remembered Dancy being hard on Calcote on one occasion at a counselor's meeting. According to Lomax, Dancy had a condescending manner.

26. Alphonzo Martinez, a Spanish surnamed American who was deputy center director during 1972, testified that while he was Ras Dancy's supervisor he never knew of Dancy engaging in any racial discrimination. Jesse DeShay, a black male and a counselor at Gary Job Corps Center, testified that Dancy did not commit acts of racial discrimination, rather Dancy was hard on everyone and chastised black counselors as well as white.

27. Ray M. Ramirez, lead investigator for the Equal Employment Opportunity Commission (EEOC), testified that he investigated the charges made by Calcote against the Texas Educational Foundation and found sufficient evidence of discrimination against Calcote in that he was hired at a lower level of pay and received a smaller increase in salary than black employees. Ramirez testified that he found the jobs of other persons to be essentially the same as plaintiff's, but these persons were given different pay schedule classifications from plaintiff. Ramirez also stated that he did not find sufficient evidence of racial harassment.

28. Calcote resigned from his position at the Gary Job Corps Center on October 27, 1972, despite urgings by Mike Flores, Assistant Personnel Director, that Calcote complain to the EEOC of the racial discrimination without resigning. No one at the Texas Educational Foundation suggested to plaintiff that he resign. Calcote stated that he wanted to resign because of the harassment.

29. After resigning, plaintiff obtained work as a counselor for the Carrizo Springs School District in December 1972 and was paid a starting salary of $638.39 per month.

30. During the time of his employment at Gary Job Corps Center, Calcote earned $724 less than Archie David. After his resignation, plaintiff lost wages of $5,172.77 up to the time his salary at Carrizo Springs reached $1,007 per month, which is the salary Archie David was earning at the time of plaintiff's resignation.

31. Plaintiff's attorney, Luis M. Segura, testified that the necessary and reasonable time expended by him on behalf of plaintiff was 96 hours, not including the last day of trial. A reasonable fee for his services, according to Segura, would be $80 per hour or a total of $8,580.

## DISCUSSION

■ This case presents an unusual twist to the racial discrimination problem: the plaintiff is a white man claiming blacks received preferential treatment at the hands of the defendant. Plaintiff has alleged violations of Title VII of the Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e–2, claiming that defendant has discriminated against him because of his race. The allegations are that the Texas Educational Foundation, Inc. at its Gary Job Corps Center hired the plaintiff at a lower salary than blacks, granted him a smaller salary increase than blacks, and allowed the plaintiff's supervisor to harass him because of his race. The Court has jurisdiction of this suit under 42 U.S.C.A. § 2000e–5(f) and 28 U.S.C.A. § 1343(4).

■ Title VII of the Civil Rights Act prohibits all forms of racial discrimination in all aspects of employment and in all degrees. *Rowe v. General Motors Corp.,* 457 F.2d 348, 354 (5th Cir. 1972). Title VII has proscribed "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.,* 401 U.S. 424 at 431, 91 S.Ct. 849 at 853, 28 L.Ed.2d 158 (1971). The only justification for standards or procedures that may discriminate in effect against employees of a racial grouping is that such standards and procedures proceed from a legitimate business necessity. *Griggs v. Duke Power Co., supra, Rowe v. General Motors Corp., supra.* Moreover, a plaintiff need only show that a policy has racially discriminatory impact, and then the burden shifts to the defendant to prove a legitimate business necessity. *See, Young v. Edgcomb Steel Co.,* 363 F.Supp. 961, 970 (M.D.N.Car.1973), *Robinson v. Lorillard* [A page of the opinion as filed in the District Court is missing at this point.].

other counselors equally. The testimony and exhibits disclose a failure by defendant to apply its salary policies uniformly, and the result was racial discrimination.

■ The policy of salary administration established by the Texas Educational Foun-

dation was that a person newly employed be paid at the minimum salary for a schedule or salary range. Exhibits offered at trial revealed, however, that Archie David was hired under a Progression Schedule and paid the top salary on the entire schedule. The plaintiff, Herman Calcote, was hired under a Classified Merit Schedule and paid close to the minimum salary for his group and years of experience. Salaries paid to other employees at the Gary Job Corps Center revealed similar discrepancies between policy and reality favoring blacks over whites. The defendant's pay policy was apparently applied capriciously and discriminatorily. The arbitrariness of this policy is particularly pointed up by the fact that the plaintiff's salary was reduced from $950 to $900 per month at the time he began work, and no explanation was given. Plaintiff, therefore has shown racial discrimination in the effect of defendant's arbitrary application of salary policy, and the Texas Educational Foundation has failed to show a legitimate business purpose for this discrimination. Plaintiff must prevail on his claim of racial discrimination in payment of salaries at the Gary Job Corps Center.

■ Plaintiff also has sustained his burden of proof with regard to racial discrimination in the defendant's dispensation of merit salary increases. The policy of Texas Education Foundation was that salary increases be granted on the basis of an employee's personal appraisal. Herman Calcote received a rating of 4.3, and Archie David received a rating of 4.0. Both men were recommended for a 6.0% salary increase, but Calcote was granted only a 5.0% increase. Since Calcote received a higher personal rating, the fact that he received a lower increase demonstrates a capricious and arbitrary application of the merit raise policy. The effect of this arbitrariness was racial discrimination in pay increases as between Herman Calcote and Archie David. While Archie David is used as a comparison to show racial discrimination in the granting of raises, other examples of the arbitrary policy could be cited. This discrimination is a barrier to equal employment which, even in this small degree, cannot be permitted.

The final claim made by plaintiff is that the defendant, Texas Educational Foundation, permitted harassment of Calcote by his supervisor, Ras Dancy, and this harassment was because of Calcote's race. Plaintiff's claim is that this harassment and defendant's permitting it constituted a constructive discharge.

The doctrine of constructive discharge is that an employer is responsible for the discharge of an employee where he has made working conditions so intolerable that the employee is forced to resign. *Muller v. U. S. Steel Corp.*, 509 F.2d 923, 929 (10th Cir. 1975), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41. The Fifth Circuit has recognized that the doctrine of constructive discharge is applicable to Title VII cases. *See Young v. Southwestern Sav. and Loan Assoc.,* 509 F.2d 140 (5th Cir. 1975), *Robinson v. City of Dallas,* 514 F.2d 1271, 1272 (5th Cir. 1975). The Fifth Circuit has also suggested that the phrase "terms, conditions, or privileges of employment" in section 703 of Title VII could be read expansively to give employees protection from the "practice of creating a working environment heavily charged with ethnic or racial discrimination." *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). Racial harassment that led to an employee's resignation would appear to give rise to a valid claim either under the doctrine of constructive discharge or under an expansive reading of the prohibition against discrimination because of race in the "terms, conditions, or privileges of employment."

The testimony of plaintiff showed that his supervisor, Ras Dancy, had harassed him by ridiculing his efforts to help his former Supervisor, Ben Wilson, Jr., by writing a deficiency report on Calcote, by talking down to him and to other white counselors, and by trying to frustrate him at every opportunity. Wilton Lomax, a former vocational counselor and a Caucasian, testified that in his opinion Ras Dancy was a racist. Alphonzo Martinez and Jesse DeShay testified that Dancy was not a racist but was hard on all people whom he supervised. Obviously, the question of racial harassment is ultimately to be resolved only by sorting out the conflicting testimony and determining which witnesses are the more credible and convincing. The only disinterested witness in this case is Wilton Lomax, who is no longer an employee of the Gary Job Corps Center and whose testimony, therefore, must be accorded greater weight than the testimony of other witnesses. The preponderance of the evidence, therefore, is in favor of the plaintiff that he was subjected to racial harassment by Ras Dancy.

Racial harassment was finally the reason for the plaintiff's resignation. The discrimination in salary and in merit salary increases were part of the overall environment of racial harassment that led to plaintiff's resignation. Plaintiff's discovery of salary inequities together with the awareness of racial harassment tolerated by defendant culminated in plaintiff's dissatisfaction with his working conditions. That these intolerable conditions were brought about and permitted by defendant is sufficient proof of a constructive discharge of plaintiff. Plaintiff, therefore, is entitled to recover damages for this constructive discharge.

Since plaintiff has shown discrimination in salary paid to him during his time of employment at the Gary Job Corps Center, he is entitled to the difference in pay between what he received and what Archie David, the black man, received. The difference in salary, including merit salary increases, amounted to $724 during the time Calcote worked at Gary Job Corps Center. Calcote also is entitled to the wages he lost as a result of his constructive discharge. The salary paid to Calcote at his job as counselor for the Carrizo Springs School District was $638.39 per month to start. His salary eventually was increased above the salary level of $1,007, which is the salary earned by Archie David at the time of plaintiff's resignation. The wages lost before Calcote's salary reached the $1,007 per month level were $5,172.77. Calcote, there-

238

fore, lost a total of $5,896.77 and is entitled to recover this amount.

 Plaintiff is entitled to recover reasonable attorney's fees as well. Plaintiff's attorney stated that he spent 96 hours preparing plaintiff's case and trying it. Using $45 per hour as a reasonable hourly rate, plaintiff should be awarded attorney's fees in the amount of $4,320. It is so ordered.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of this suit under 28 U.S.C.A. § 1343(4).

2. Defendant, Texas Educational Foundation, has violated Title VII of the Civil Rights Act of 1964, § 703(a), 42 U.S.C.A. § 2000e–2 by:

a) Hiring plaintiff at a lower salary than other employees of a different race and of equal qualifications, in disregard of its own salary policy;

b) Granting plaintiff smaller merit salary increases than those granted employees of a different race with lower personal evaluation ratings, in disregard of its salary increase guidelines;

c) Permitting plaintiff to be subjected to racial harassment by his supervisor.

3. Plaintiff was constructively discharged by defendant as a result of the latter's making working conditions intolerable by allowing the violations of Title VII noted above.

4. Plaintiff is entitled to recover the sum of $5,897.77 from defendant plus reasonable attorney's fees of $4,320.

5. Judgment will be entered for plaintiff.