Corenna TAYLOR, Appellee,

v.

General Jimmie "Red" JONES,
Appellant.

United States of America, Intervenor.

Corenna TAYLOR, Appellee,

v.

General Jimmie "Red" JONES,

United States of America, Appellant.

Nos. 80–1378, 80–1825.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 11, 1980.

Decided June 30, 1981.

John W. Walker, P.A., Richard Quiggle, argued, Little Rock, Ark., for appellee.

Steve Clark, Atty. Gen., David L. Williams, Asst. Atty. Gen., argued, Little Rock, Ark., for appellant General Jimmie "Red" Jones.

George W. Proctor, U. S. Atty., A. Doug Chavis, Asst. U. S. Atty., Little Rock, Ark., Robert A. DeMetz, argued, Michael J. Wentink, Peter B. Lowenberg, Dept. of the Army, Washington, D. C., for intervenor-appellant.

Before GIBSON, Senior Circuit Judge, and HEANEY and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

James H. Jones, Adjutant General of the Arkansas National Guard, and the United States appeal from a judgment of the district court finding that appellee Corenna Taylor had been discriminated against on the basis of her race, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. We affirm the liability finding and the injunctive relief ordered, and remand the back pay award.

I

## BACKGROUND

Corenna Taylor was employed by the Arkansas Army National Guard from March 1, 1974, to October 2, 1974. She served as a

recruiter from March 1, 1974, until June 30, 1974. Thereafter, she worked as a mail room clerk. Through this period, Taylor was a member of the National Guard, drilling one weekend per month and for a two-week training period in the summer.

Taylor filed suit on March 12, 1976, alleging that the Arkansas National Guard discriminates against black members and employees of the Guard, and against blacks eligible for such positions. She charged that she had been underclassified and underpaid when employed by the Guard as a mail room clerk, that she had been subjected to racial epithets and slurs and that she had been denied transfer or promotion despite repeated requests. She sought wide-ranging relief, including affirmative efforts by the defendants to recruit black Guard members and employees.

On February 20–21, 1980, the case was tried before the Honorable Richard S. Arnold.[1] At the conclusion of trial, that court held that the defendant[2] had intentionally discriminated against the plaintiff on account of her race, in violation of Title VII and 42 U.S.C. § 1983. It found that Taylor's demotion from recruiter to mail room clerk was racially motivated, and that her resignation from the latter position was forced by the noxious racial atmosphere existing in the Arkansas Military Department. The defendant was ordered to reinstate the plaintiff, with back pay, to her recruiter position or a comparable one. The court enjoined the defendant from hiring any new employees. The injunction was later modified to permit the defendant to fill any openings as long as one-half of those persons hired were black.[3] *Taylor v. Jones*, 489 F.Supp. 498 (E.D.Ark.1980).

The defendant subsequently filed a motion for a new trial, claiming, *inter alia*, that he had been unfairly surprised by the introduction of the recruiter position into the trial as a basis for liability. The court granted this motion. The new trial was limited by the court to two issues: (1) "whether plaintiff's nonrenewal as a recruiter was racially motivated," and (2) "what permanent equitable relief should be granted." The United States successfully moved to intervene and participated in the limited retrial.

On August 8, 1980, the district court entered its opinion and final judgment. The court did not disturb its earlier finding that the plaintiff had been constructively discharged from her position as mail room clerk because of her race, in violation of Title VII of the Civil Rights Act of 1964.[4] It reiterated its finding that the defendant had deliberately discriminated against the plaintiff on account of her race by failing to renew plaintiff's appointment as a recruiter. It found, however, that liability for this unlawful act was appropriately based on 42 U.S.C. § 1981. It again ordered that the plaintiff be reinstated as a recruiter or given a comparable position, with back pay, and awarded plaintiff attorney's fees. The injunction *pendente lite* was dissolved, and the defendant was directed to hire at least one black person for every two white persons hired until the level of black employees of the Guard reaches sixteen percent. *Taylor v. Jones*, 495 F.Supp. 1285 (E.D.Ark. 1980).

Defendant Jones appeals from the district court's order, contending that there was no jurisdictional or factual basis for the court's finding of liability and that the relief afforded the plaintiff was improper.

---

1. United States Circuit Judge, sitting by designation.

2. Suit was originally filed against the Arkansas Army National Guard. At the court's motion, General James H. Jones was substituted as the named defendant at the beginning of trial. General Jones is the Adjutant General of the State of Arkansas, with administrative supervision over all employees of the Arkansas Military Department.

3. The court also modified the injunction to permit the defendant to fill three positions deemed by the court to be "directly related to national defense," and to hire a black captain who was in line for the position of Equal Opportunity Specialist.

4. 42 U.S.C. § 1983 was not a basis for liability in the court's final judgment.

The United States also appeals. It contends that the plaintiff lacked standing, that it was denied an adequate opportunity to defend its interests and that the doctrine of sovereign immunity bars the relief ordered. We find the appellants' arguments to be without merit and affirm the judgment of the district court except with respect to the back pay awarded.

II

*FINDINGS OF DISCRIMINATION*

The Arkansas Army National Guard is staffed by both military and civilian personnel. The military personnel include all "members" of the National Guard, most of whom are actively associated with the Guard only on weekends and during a two-week training period each summer. Some military personnel are on full-time military duty.

The Guard employs two types of civilian personnel: federal technicians and state employees. The federal technicians must be, with a few exceptions, members of the National Guard. As civilian federal employees, they are subject to civil service regulations and are paid with federal funds. Many of the approximately 986 federal technician positions are jobs of a technical nature or involve specialized skills.

The state employees, of which there are approximately 115, are not required to be members of the National Guard. They fill positions created by the State of Arkansas and may be paid with either state or federal funds. Federal funds used to pay state employees' salaries are placed in the State Treasury and are disbursed in accordance with appropriations bills passed by the state's General Assembly. Most of the state employees are clerical workers or lower-level administrative personnel.

The military head of the Arkansas National Guard is the Adjutant General, an officer appointed by the Governor of Arkansas. The Adjutant General supervises and has appointing authority over all personnel of the Guard, including military members and federal and state employees.

The lower court found, and it is not disputed, that Corenna Taylor was a state employee when she worked in the mail room and was, therefore, protected by Title VII. The court held that the plaintiff had been constructively discharged from the mail room in violation of the Act. After the limited retrial, the court concluded that Taylor's tenure as a recruiter was full-time military duty. The court held that the deliberate racial discrimination Taylor suffered while on military duty was actionable under 42 U.S.C. § 1981. The latter ruling is challenged on appeal and will be discussed in detail below.

A. *Taylor's Resignation from Mail Room Clerk Position.*

The defendant does not contend that the district court erred in holding him liable under Title VII for the constructive discharge of Corenna Taylor from her mail room position; it would be futile to do so. We, nevertheless, recite some of the overwhelming evidence relating to the "dismal" racial atmosphere at the Arkansas Military Department to serve as a backdrop for this opinion.

■ The record clearly supports the district court's finding that Taylor's resignation "was forced by the racial atmosphere existing in this Department; that she stayed as long as any self-respecting black person could have been expected to stay; and specifically that a white woman in her position would not have been treated in the same fashion."

A number of black employees of the Guard, whose testimony was specifically credited by the district court, recounted numerous instances in which they had been subjected to racial slurs, epithets and jokes. Marcellus Person, an EEOC counselor with the Guard, described the racial atmosphere at Camp Robinson as "degrading." On frequent occasions, the terms "niggers" and "spooks" were used in his presence. He was told by co-workers that he was a "token" and was called that by some. John Watson, who in 1971 became the first black

ever employed by the Guard, testified that his supervisor had physically threatened him, supposedly in jest, and consistently harassed him. Larry Hale, hired to replace Corenna Taylor in the mail room, was frequently called an "uppity nigger" or "smart nigger." He stated that he and other black males were called "boy;" the white males were not so addressed. Hale also described a racially-charged incident that occurred while he was on training duty: National Guard Military Policeman instigated a fight with some black individuals, and then returned to the barracks where Hale was lodged to get billy clubs and to recruit other people to help "finish what they had started." "Let's go and get these niggers" was the rallying cry. On one occasion, an employee of the Guard, who openly claimed to be a Ku Klux Klan member, hung up a hangman's noose in the supply rooms. As the district court stated, "[t]he message conveyed or attempted to be conveyed by that action was unmistakable."

The pervasive atmosphere of prejudice in the National Guard was exacerbated for the plaintiff by the nature of her position. Taylor testified that the mail room job involved a great deal of heavy lifting, an aspect of the job that had not been explained to her before she took it. She felt that this physically demanding work was assigned to her because she was black. This assertion was buttressed by subsequent testimony: Corenna's two predecessors in the mail room, and the man hired to take her place were all black. Colonel Burdell, Director of Personnel and Administration for the Adjutant General, could think of no other job at Camp Robinson, except perhaps in the security guard force, that has had such a high percentage of black participation. There was also evidence that this traditionally "black job" was underclassified.

The plaintiff testified that racially offensive jokes were told in her presence, including one that ended with the punch line, "Oh, don't worry about it, we're just barbecueing a few niggers." In another instance, a state employee of the Guard responded to a question directed at him in

Taylor's presence by saying, "Well, you know how that goes, they start treating us like niggers, they're making us park in the back and enter through the back door now."

There is, thus, ample evidence in the record to support the district court's finding that the racial atmosphere of the Arkansas Military Department was "dismal," and further, that "the atmosphere of racial discrimination and of prejudice was so pervasive and so long continuing in this Department of State Government that the employer must have become conscious of it." Employer toleration of a racially discriminatory work atmosphere clearly violates Title VII. *See Bundy v. Jackson*, 641 F.2d 934, 943–944 (D.C.Cir.1981); *Firefighters Inst. for Racial Equality v. City of St. Louis*, 549 F.2d 506, 514–515 (8th Cir.), *cert. denied*, 434 U.S. 819, 98 S.Ct. 60, 54 L.Ed.2d 76 (1977); *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). This is not a situation in which an employee has been the object of isolated, casual ethnic slurs. *See Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87 (8th Cir. 1977). Rather, the plaintiff was subjected to an atmosphere heavily charged with racial discrimination which she endured as long as could be expected.

As has been noted, employer toleration of a discriminatory atmosphere alone gives rise to a cause of action by the plaintiff. However, the district court further found that the plaintiff was entitled to relief under the doctrine of constructive discharge. The court determined that Corenna Taylor's resignation was forced by the opprobrious racial atmosphere existing in the Guard, and that these conditions were the result of deliberate and conscious acts by the defendant. These findings are not clearly erroneous and fully support the court's ruling that the defendant is liable under Title VII for the plaintiff's resignation. *See Calcote v. Texas Educ. Foundation, Inc.*, 458 F.Supp. 231 (W.D.Tex.1976), *aff'd*, 578 F.2d 95 (5th Cir. 1978); *Young v. Southwestern Sav. and Loan Ass'n*, 509 F.2d 140 (5th Cir. 1975).

B. *Failure to Renew Taylor's Recruiter Appointment.*

The district court correctly found that when Taylor functioned as a recruiter, she was on full-time military duty with the Arkansas National Guard; she was neither a federal or state employee. She was under the command of state military authority, subject to court-martial, and performed her duties in military uniform. As a member of the Arkansas National Guard, Taylor was also required to be a member of the National Guard of the United States, the senior reserve component of the Armed Forces of the United States.

We have previously held that "neither Title VII nor its standards are applicable to persons who enlist or apply for enlistment in any of the armed forces of the United States." *Johnson v. Alexander,* 572 F.2d 1219, 1224 (8th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978). We do not see any significant distinction, for Title VII purposes, between a member of the Army or Air Force and a member of the reserve component of those forces, the National Guard. In neither case is the relationship between the government and the member that of employer-employee; military service differs materially from civilian employment, whether public or private, and is not appropriately governed by Title VII. *Id.* at 1223–1224.

We cannot conclude that, by implicitly excluding military personnel from the purview of Title VII, Congress intended such persons to be without a remedy. *See Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (congressional employee not covered by Title VII states private cause of action under Due Process Clause of Fifth Amendment for deliberate sex discrimination). As Judge Arnold noted below,

the question comes down to this: if plaintiff has proved that she lost her recruiter position as a result of deliberate racial discrimination, does she have a judicial remedy? In a society where few policies are as deeply rooted in constitutional jurisprudence as the prohibition against conscious racial discrimination, the answer must be yes.

495 F.Supp. at 1291.

The district court correctly found that the plaintiff was entitled to relief under 42 U.S.C. § 1981 for the intentional discrimination that she suffered.[5] *See* Harris, *Protections Against Discrimination Afforded to Uniformed Military Personnel: Sources and Directions,* 46 Mo.L.Rev. 265 (1981). Section 1981 applies to all types of racial discrimination, public or private. *See Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Young v. Int'l Tel. & Tel. Co.,* 438 F.2d 757 (3d Cir. 1971); *Waters v. Wisconsin Steel Works of Int'l Harvester Co.,* 427 F.2d 476 (7th Cir.), *cert. denied,* 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970); *cf. Jones v. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (decided under section 1982; that section was also passed as part of Civil Rights Act of 1866). Our opinion in *Johnson v. Alexander, supra,* strongly suggested that although military personnel cannot sue under Title VII, section 1981 relief may be available if sufficient proof of racial discrimination is established. Section 1981, although originally enacted under the Thirteenth Amendment, was reenacted pursuant to Congress's power under the Fourteenth Amendment. Intentional racial discrimination would, of course, violate the Equal Protection Clause of that Amendment.

---

5. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. The district court held that the plaintiff's enlistment as a recruiter was a "contract" within the meaning of section 1981, and that the failure of the defendant to renew her appointment violated that statute if it was racially motivated. We agree.

■ Our rulings today and in *Johnson v. Alexander, supra,* are consistent with the posture courts have traditionally taken toward the military. Although courts are unwilling to second-guess judgments requiring military expertise and are reluctant to substitute court orders for discretionary military decisions, they will examine servicepersons' claims that they have been deprived of a constitutional right. *See Beller v. Middendorf,* 632 F.2d 788 (9th Cir. 1980); *Dilley v. Alexander,* 603 F.2d 914, 920 (D.C. Cir.1979); *Crawford v. Cushman,* 531 F.2d 1114 (2d Cir. 1976); *Mindes v. Seaman,* 453 F.2d 197 (5th Cir. 1971).

■ We also hold that the court's "ultimate" finding of fact—that the plaintiff bore her burden of persuasion that she had been the victim of deliberate discrimination—was well supported by factual findings that are not clearly erroneous. *See Bundy v. Jackson, supra,* 641 F.2d at 950; *Kinsey v. First Regional Sec., Inc.,* 557 F.2d 830, 835–836 (D.C.Cir.1977).

The evidence of discrimination adduced below can be analyzed within the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That decision, which established the order and allocation of proof in employment discrimination cases, was rendered in a Title VII action; its principles, however, have been applied in cases under section 1981.[6] *See Hudson v. IBM,* 620 F.2d 351, 354 (2d Cir.), *cert. denied,* 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1281 (7th Cir. 1977); *Sabol v. Snyder,* 524 F.2d 1009, 1012 (10th Cir. 1975); *Long v. Ford Motor Co.,* 496 F.2d 500, 505 (6th Cir. 1974).

■ The plaintiff clearly met her burden of proving a *prima facie* case of racial discrimination. First, she is a member of a racial minority. Second, she was qualified for the recruiter job she was performing. Third, her performance as a recruiter was satisfactory. Fourth, her orders were not renewed, despite the fact that she had understood that they would be if her work was satisfactory. Finally, at least one white person's recruiting orders were renewed at the same time that the plaintiff's were not. These findings by the court, which are not clearly erroneous, were sufficient to shift the burden to the defendant to articulate a legitimate, nondiscriminatory reason for the failure to renew Taylor's orders. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802,[7] 93 S.Ct. at 1824.

■ The nature of the burden that shifts to the defendant has recently been explicated by the Supreme Court. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant must present

---

**6.** We do not agree with the defendant that the standards by which employment discrimination cases are measured—in this instance, disparate treatment analysis—are inapplicable to Corenna Taylor's claim because of this Court's holding in *Johnson v. Alexander,* 572 F.2d 1219, 1224 (8th Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978) ("[N]either Title VII *nor its standards* are applicable to persons who enlist or apply for enlistment in any of the armed forces of the United States." [Emphasis added.]) Our ruling that section 1981 relief is available to military members necessarily means that the plaintiff's claims of intentional discrimination will be examined within the framework customarily applied in such cases. The Court in *Johnson* did not hold that section 1981 does not apply to the military; that claim was not before it. The Court implied that such relief would be available in the proper case. The phrase "and its standards" can only refer to the Title VII doctrine which provides relief for employment practices that have a disparate impact on a protected group.

**7.** The *prima facie* case outlined above does not literally track the four-pronged test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That test was designed for a claim of a racially-based refusal to hire. The Supreme Court recognized that courts must adjust the definition of a *prima facie* case to the differing situations that might arise in employment discrimination cases. *See McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13. The courts have done so, outlining various employer actions from which the court can reasonably infer discriminatory animus. *See, e. g., Bundy v. Jackson,* 641 F.2d 934, 950–953 (D.C.Cir.1981) (failure to promote); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir. 1977) (discharge).

evidence that "raises a genuine issue of fact as to whether it discriminated against the plaintiff. * * * The explanation provided must be legally sufficient to justify a judgment for the defendant." The defendant need not persuade the court that it was actually motivated by the proffered reason; the burden of persuasion regarding discriminatory animus remains at all times with the plaintiff. *Id.* 101 S.Ct. at 1091. The plaintiff can meet that burden by convincing the court that the reason articulated by the defendant was merely a pretext for discrimination. *Id.* 101 S.Ct. at 1091.

The reasons articulated by the defendant to justify the nonrenewal of Taylor's orders were inconsistent. At the first trial, a defense witness claimed that Taylor was not kept on because of the unavailability of funds. As the district court noted, however, this explanation cannot be squared with the fact that at least one other white recruiter on duty during Taylor's tenure was retained, and another white woman was hired not long after Taylor's orders expired.

At the second trial, Colonel William A. Cook, the state recruiting manager during Taylor's tour of duty, first stated that he had decided not to renew her because of funding problems; he then testified that he did not make a decision regarding Taylor, that her orders had simply expired.

The plaintiff introduced more than sufficient evidence to persuade the court that these proffered explanations were, in fact, a pretext for racial discrimination. The testimony of Sandra Fletcher Williams, a white woman who served as recruiter from December 1, 1973, to April 30, 1975, was particularly significant. Williams testified that her and Taylor's supervisor, Sergeant Carl Lee (Bo) Howell, had expressed racist attitudes toward black people. She testified that Howell had made improper sexual advances to both her and Taylor. Howell told Williams that he would determine whether or not her orders, due to expire the same day as Taylor's, would be renewed. Taylor testified that Howell had sexually harassed her, physically and verbally, and intimated that she would regret it that she had rebuffed his sexual advances. Although neither woman submitted to Sergeant Howell's advances, only Williams' orders were renewed. Williams, who in the district court's words "was familiar with the situation at the time and * * * has no motive to fabricate," concluded that Taylor's demotion to mail room clerk was effected by Sergeant Howell and his superiors because Taylor had complained of racial discrimination and was going to make trouble. The district court further noted, "The fact that Sergeant Howell, although he is still an employee of the Arkansas National Guard, was not called to testify at either trial, speaks volumes. The Court can infer only that the Sergeant's testimony would not have been favorable to the defendant." We are certainly not inclined to reverse the trial court's finding of deliberate discrimination in the face of the persuasive and alarming testimony supporting it.

### III
### *REMEDY*

The district court ordered the defendant to reinstate the plaintiff in the position of recruiter, or to a "comparable civilian job, state or federal, comparability to be judged according to pay, status, benefits, and responsibility." It awarded her back pay in the amount of $2,470.55 and $19,671.73 in attorneys' fees and costs. The court further directed the defendant "to hire at least one black person for every two white persons employed, in both state and federal positions, until the level of black employees reaches 16 per cent."[8] Record-keeping and reporting requirements were also imposed to ensure compliance with the hiring decree.

The remedy afforded the plaintiff is challenged by both the defendant, General

8. The parties stipulated that blacks constitute at least sixteen percent of the general population of Arkansas. Job openings are generally filled by present members of the Guard, of which blacks constitute twenty-three percent. The district court chose the lower figure in order to minimize the defendant's burden in fulfilling the decree.

Jones, and the intervenor, the United States.

### A. *Contentions of the Defendant.*

Jones' primary argument is that the district court erred in imposing hiring requirements on the defendant. He also contends that the back pay award is barred by the Eleventh Amendment and that the attorneys' fees awarded were excessive.

### 1. *Hiring Requirements.*

■ We are not persuaded by the defendant's argument that we should alter the judgment entered by the district court and dissolve the racial hiring standards imposed. We note that the relief to be afforded when intentional racial discrimination is proved is within the trial court's discretion. *See* 42 U.S.C. § 2000e–5(g); [9] *Carter v. Gallagher,* 452 F.2d 315 (8th Cir.), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972). There is no indication that the district court misapprehended the applicable principles of law in its fashioning of relief. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 415–416, 95 S.Ct. 2362, 2370–2371, 45 L.Ed.2d 280 (1975).

■ The district court found that a "broad-ranging pattern and practice of racial discrimination" existed in the Arkansas National Guard that was long-standing and "pervasive." This finding is amply supported by the record. Statistical evidence is particularly revealing. There were no black members of the National Guard until 1965; the first black employee of the Guard was not hired until 1971. Although blacks now constitute twenty-three percent of the Guard membership, they only hold two percent of its full-time jobs. All of the decisionmakers in the Guard in Eastern Arkansas are white, with the exception of Lieutenant Nathaniel McGee, a Guard member

since 1971. There are more than ninety Administrative Supply Technicians who are in charge of the armories; only one of the ASTs is black. The paucity of black personnel is not surprising in light of the procedure used to fill positions. When job openings are announced, a screening board composed of three persons is impaneled to consider applicants. During the entire history of the Arkansas National Guard, only one black has been a member of the screening panel.

The district court further found that although some improvement had been made from the "dismal" racial atmosphere existing at the time of Corenna Taylor's constructive discharge, "the racial atmosphere in the Arkansas National Guard is still far below that civilized and decent respect for coworkers that both the state and its citizens are entitled to." This finding, too, is amply supported by the record.

■ Under these circumstances, it was clearly within the district court's discretion to conclude that more was required than to simply reinstate Taylor into a work atmosphere "only somewhat improved from the appalling conditions that obtained in 1974." As the Supreme Court has noted, "Where racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody, supra,* 422 U.S. at 418, 95 S.Ct. at 2372 (citing *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)). In cases in which a discriminatory atmosphere has been shown, the more common forms of relief, such as reinstatement and back pay, may not be appropriate or adequate, and the district court should fashion injunctive

---

**9.** That section provides in pertinent part:

(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropri-

ate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

relief to alleviate the unlawful practice before it. *See Bundy v. Jackson, supra,* 641 F.2d at 946–948. The court has done so here: witnesses for both the plaintiff and the defendant testified that as the number of blacks employed by the Guard has increased, the degree of racism present in the work environment has decreased.

We have previously recognized the district courts' power to order affirmative action programs requiring that preferential treatment be afforded to minority persons. *EEOC v. Contour Chair Lounge Co.,* 596 F.2d 809 (8th Cir. 1979); *Firefighters Institute v. City of St. Louis,* 588 F.2d 235 (8th Cir. 1978), *cert. denied,* 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979); *Carter v. Gallagher, supra,* 452 F.2d at 331. There is no indication that significant improvement will be made in the work atmosphere to which Taylor must return absent the relief afforded. In fact, the evidence is to the contrary.

The court's order, moreover, is carefully drawn to protect the defendant's rights. It does not impose any restraint on the defendant with respect to military appointments or positions. The defendant is not required to hire anyone as a federal technician who does not meet all of the qualifications for that position as established by federal statutes, regulations and manuals.

The decree is a moderate one, providing the Adjutant General maximum flexibility in fulfilling its terms. The district court, consistent with its reasoning, could have ordered the plaintiff to be reinstated into the specific office where she worked as a recruiter and commanded that the racial makeup of that office be altered. However, this would have constrained the Adjutant General much more than the present order does. The present order does not specify the geographical location or the type of positions that must be filled by blacks. Thus, the Adjutant General will not be hampered by the uneven geographical distribution of blacks in the state, or by the disparities in skills required by the Guard positions. Moreover, it is not realistic to assume that an equitable racial balance in one office will significantly affect the discriminatory animus which the court found to permeate the Arkansas National Guard. Importantly, the court's opinion provided that: "If a specific job opening occurs for which, after diligent affirmative effort, no qualified black person applies, defendant may apply to the Court for relief, which will be granted if a sufficiently persuasive showing can be made."

The defendant argues that the court has erroneously granted class-action relief in a suit that proceeded as an individual action. This argument is without merit. The district court, having found a violation of section 1981 ordered the affirmative equitable relief it considered appropriate. *See Carter v. Gallagher,* 452 F.2d at 328–329. The relief awarded cannot be considered peculiarly class-action relief. The district court's order does not provide for the reinstatement of or back pay awards to any employee other than Corenna Taylor. Its sole design is to ensure the relief to which Taylor is entitled—reinstatement into a work place that is not infected with virulent racism. It is a remedy carefully tailored to fit the circumstances.

The cases cited by the defendant are inapposite. In both *Danner v. Phillips Petroleum Co.,* 447 F.2d 159 (5th Cir. 1971), and *Nance v. Union Carbide Corp.,* 540 F.2d 718 (4th Cir. 1976), *vacated,* 431 U.S. 952, 97 S.Ct. 2671, 53 L.Ed.2d 268 (1977), the Court modified the lower court's orders mandating revision of the defendants' seniority plans. The plaintiffs in *Danner* and *Nance* had initiated individual suits alleging that they had suffered adverse consequences from their employers' discriminatory seniority systems. The Appeals Courts held that the plaintiffs' relief should have been limited to adjustment of their own seniority rights because "complete relief" could be accomplished merely by modifying those parties' seniority; the seniority of the other women in the plants, even if discriminatorily calculated, would not affect the plaintiffs. By contrast, the district court in the instant case concluded that "complete relief" could not be afforded by simply re-

turning Corenna Taylor to the work environment that forced her resignation in the first place. We agree with that conclusion.

### 2. Back Pay.

Defendant Jones challenges the award to Taylor of $2,470.55 in back pay. That figure represents the difference between what the court found Taylor would have earned had she not been unlawfully deprived of the recruiter position and what she in fact earned from 1974 through March 31, 1980.

■ We assume that even though the State of Arkansas is not the named defendant in this suit, the back pay award would be paid from public monies in the state treasury; Taylor apparently has not sought to impose individual and personal liability on General Jones for the deprivation of federal rights she suffered. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Thus, it may be that the district court improperly awarded the plaintiff retroactive monetary damages in violation of the Eleventh Amendment. *See Quern v. Jordon*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). It appears, however, that this issue was not considered by the district court. It should be given an opportunity in the first instance to decide whether its grant of back pay was properly based on section 1981.[10] Accordingly, we remand for that limited purpose.

■ It clearly would have been proper for the district court to order back pay based on the difference between what Taylor would have earned had she not been

constructively discharged from her state job in the mail room and what she in fact earned from 1974 to 1980. The court's power to order such relief under Title VII is not subject to Eleventh Amendment limitations. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). If the district court determines on remand that its award of back pay pursuant to section 1981 cannot be maintained, the plaintiff should be made whole under Title VII for the loss of her mail room position.[11]

### 3. Attorneys' Fees.

■ The defendant's final contention is that the district court erred in its computation of the attorneys' fees awarded the plaintiff. The district court properly awarded fees to the plaintiff; she prevailed on all issues of liability and on all significant aspects of relief. We conclude that the district court did not abuse its discretion in determining that the plaintiff was entitled to $18,056.64 in attorneys' fees.

Our task of review is greatly aided by the clarity of the district court's order. This Court has previously stated that the basis of the award of attorneys' fees should be set forth in detail so that the court can adequately review the record. *See Firefighters Institute v. City of St. Louis, Mo., supra*, 588 F.2d at 243. The court below has done so, and it is readily apparent that the appropriate guidelines set out in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974), have been followed in this case. *See Firefighters Institute v. City of St. Louis, supra*, 588 F.2d at 242.

10. Neither the district court nor this Court has been briefed on the question of whether Arkansas has waived its sovereign immunity in this respect. *See Marrapese v. State of R. I.*, 500 F.Supp. 1207 (D.R.I.1980). It is also possible that the *Quern* and *Edelman* decisions, which analyzed the effect of section 1983 on the states' immunity to damage suits, are not controlling in a suit based on section 1981. The language, purpose and legislative history of section 1981 are not entirely comparable to that of section 1983; thus, its effect and scope must be separately examined. *See District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602,

34 L.Ed.2d 613 (1973); *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); *United States v. City of Chicago*, 549 F.2d 415 (7th Cir. 1977).

11. The defendant has not challenged the plaintiff's right to be reinstated into her recruiter position or a comparable one. The plaintiff may have monetary claims as a result of her entitlement to a recruiter's salary since the date of the lower court judgment. This would be prospective relief clearly permissible under *Quern* and *Edelman*.

■ The court's order specified the number of hours spent by each attorney that would be compensated and noted that the hours did not represent any duplication of efforts. The hourly fee awarded varied according to the skill and experience of the lawyers involved, and the time frame within which the services were performed. A multiplier of twenty percent was added to the base figure; this, too, was within the court's discretion. As the district court noted, this case involved issues of unusual complexity requiring two separate trials. Although it was an individual action, the results obtained incidentally benefit other blacks and the citizenry of Arkansas as a whole.[12] The attorneys' fees award, payable by the defendant,[13] was proper.

### B. *Claims of the Intervenor.*

The United States moved to intervene in this action on May 23, 1980, more than four years after the complaint was filed. The first phase of the trial had been completed, and the limited retrial was scheduled to begin six days later. The Motion was granted and the United States participated in the second phase of the trial.

The government contends on appeal that the district court erred in extending its order to govern the employment of federal technicians. Such relief, it argues, is barred by the doctrine of sovereign immunity, and by the plaintiff's lack of standing. The United States further complains that it was denied the opportunity to defend its interest in the lawsuit.

### 1. *Sovereign Immunity.*

The intervenor apparently argues that sovereign immunity bars the relief ordered

against the defendant because the relief will affect a federal official in the exercise of his official functions. *See Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). This seems anomalous in light of the testimony of its own witnesses in the trial below. It is undisputed that the Adjutant General, a state employee appointed by the Governor and paid with state funds, is the appointing authority for all personnel of the Arkansas National Guard. He has full power to hire, fire, promote and assign federal as well as state employees. It is true that the Adjutant General can only hire persons as federal technicians who meet the requirements established by the federal National Guard Bureau for each position. However, the National Guard Bureau has no authority to tell the Adjutant General who should be hired from the pool of qualified candidates. Furthermore, the federal government has no practical recourse if the Adjutant General erroneously implements the federal regulations. Bernard Hurlock, the deputy director of federal technician personnel, testified that the government's only means of nullifying erroneous hiring decisions is to withdraw all monetary support for the state's technician program. This draconian measure has never been taken in any state.

■ Thus, it would exalt form over substance to consider this a suit against an officer of the United States. Because the federal government has no effective control over the exercise of the Adjutant General's hiring discretion, a suit against the United States, even if properly maintained, could not produce the desired results. The district court has constrained the only party who could alter the discriminatory racial

---

**12.** The defendant maintains that the amount of fees awarded is excessive because it is nearly eight times as much as the plaintiff was awarded in back pay. We disagree. Although the amount of back pay awarded may be considered in fashioning an attorneys' fees award, the court must also consider the impact the case will have on the law and on other affected persons. *See Johnson v. Georgia Highway Express,* 488 F.2d 714, 718 (5th Cir. 1974).

**13.** The plaintiff filed and maintained her suit only against the state defendant. To some extent, the plaintiff was forced to protect her interests against the United States after its untimely intervention into the action. The United States' role at trial, however, was primarily that of co-counsel, defending General Jones in his federal capacity. The defendant's argument that the plaintiff sued but did not "prevail" against the United States, mandating a reduction in the fee award, is not persuasive.

makeup of the Arkansas National Guard: the state's Adjutant General.[14]

■ Moreover, even if the Adjutant General were considered to be a federal officer, the doctrine of sovereign immunity does not bar the plaintiff's suit because the Adjutant General has acted beyond his statutory powers. *See Dugan v. Rank*, 372 U.S. 609, 621–622, 83 S.Ct. 999, 1006–1007, 10 L.Ed.2d 15 (1963); *Larson v. Domestic and Foreign Commerce Corp., supra*, 337 U.S. at 689, 69 S.Ct. at 1461. The Adjutant General has been found to have intentionally discriminated against the plaintiff on the basis of her race in violation of a statute specifically prohibiting such conduct. His actions were thus outside of his authority and may be the object of specific relief. *See Bowers v. Campbell*, 505 F.2d 1155, 1158 (9th Cir. 1974); *Penn v. Schlesinger*, 490 F.2d 700, 704, *rev'd on other grounds*, 497 F.2d 970 (5th Cir. 1974) (en banc), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).[15]

■ Furthermore, the record makes it clear that the specific relief granted does not run against the United States. *See Bowers v. Campbell, supra*, 505 F.2d at 1158; *Penn v. Schlesinger, supra*, 490 F.2d at 704. *See generally* Abernathy, *Sovereign Immunity in a Constitutional Government: The Federal Employment Cases*, 10 Harv. C.R.–C.L. L.Rev. 322 (1975). The United States will not be required to pay public monies to make the plaintiff whole, and the injunctive relief is limited. *Com-*

pare *Ogletree v. McNamara*, 449 F.2d 93 (6th Cir. 1971).[16] The Adjutant General has not been ordered to disregard any of the regulations established by the federal government; appointments will be made only to those who are qualified to receive them. In the event that the Adjutant is unable to fill certain positions under the terms of the order, he can apply to the court for relief. In short, the burden imposed on the federal government is so minimal that the relief cannot be considered to run against the United States. Consequently, sovereign immunity does not bar the claim.

### 2. Standing.

■ The intervenor also contends that the plaintiff lacks standing to challenge federal employment actions. This argument is patently without merit. The test for standing has two parts: (1) whether the plaintiff has an "injury in fact" because of the challenged actions, *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972), and if so, (2) whether the injury was to an interest arguably within the "zone of interests" to be protected or regulated by the statutes that are claimed to have been violated. *Ass'n of Data Processing Serv. Organization v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

■ Taylor clearly satisfies both parts of this test. She was the victim of inten-

---

**14.** We necessarily reject, as well, the intervenor's claim that the district court erroneously granted relief without first making a finding of discrimination against the United States. The relief was not imposed on the United States; it was imposed on the Adjutant General, who was expressly found to have intentionally discriminated against the plaintiff on account of her race.

**15.** Our decision in *Gnotta v. United States*, 415 F.2d 1271 (8th Cir. 1969), *cert. denied*, 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970), is not controlling here. In *Gnotta*, the plaintiff's claims against the United States and the Army Corps of Engineers were dismissed on the basis of sovereign immunity. The Court stated that "[t]his obviously is not a case which concerns either of the exceptions recognized in *Dugan v.*

*Rank* * * * namely, where the officer's act is beyond his statutory power or where, although the action is within the scope of his authority, the power, or the manner of its exercise, is constitutionally void." *Id.* at 1277.

**16.** The complaint in *Ogletree v. McNamara*, 449 F.2d 93 (6th Cir. 1971), sought to completely enjoin the operation of the Civil Service and Air Force antidiscrimination regulations and the Air Force promotion system. Such relief, if granted, would clearly have contravened the controlling principle that "litigation must not be allowed to stop government in its tracks." *Id.* at 100. *See Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949).

tional racial discrimination, conduct which Title VII and section 1981 were specifically enacted to eradicate. The federal government's standing argument is, in reality, a restatement of its contention that the district court improperly ordered relief against the United States. As detailed earlier, however, the hiring policies of the federal government are not challenged; the plaintiff has merely sought and obtained relief against the state Adjutant General.

### 3. *Presentation of Evidence by the United States.*

The intervenor's final argument is that it was denied an opportunity to defend its interests in the court below. This argument, too, is meritless. It is true that the government was not present at the first trial; it expressed an interest in the litigation only after the first trial was complete. It did, however, participate in the retrial. Two attorneys appeared for the government and presented numerous witnesses and documentary evidence.

It is not true, as the intervenor contends, that the initial trial was dispositive of the relevant issues. The second trial was for the express purpose of determining whether the failure to renew plaintiff's appointment as a recruiter was racially motivated and to determine whether affirmative equitable relief should be granted. The government chose not to challenge plaintiff's allegations of discrimination but did present extensive evidence on the question of whether the Adjutant General's hiring practices could be enjoined.

Only one significant issue was foreclosed by the first trial; the court did not reconsider its conclusion that the racial atmosphere of the Guard in 1974 forced Taylor's resignation from the mail room. The government does not argue, however, that it would have been able to offer additional proof on this issue. In fact, as we have noted, the government has never addressed the merits of the plaintiff's complaint. A good deal of testimony was received at the second trial regarding the present racial atmosphere of the Guard. Although the

court's equitable powers were triggered by the 1974 violation, the relief it fashioned was based on its findings concerning the situation in the Guard at the time of the retrial. Thus, the government had ample opportunity to influence the relief fashioned in response to that situation.

The order of the district court is affirmed in part and reversed in part. Costs will be taxed to the appellant. Counsel for the appellee will submit an application to this Court for attorneys fees on appeal within ten days of the date of this order. The appellant will have five days thereafter to respond to the application.